THE PEOPLE OF THE STATE OF ILLINOIS, Respondent-Appellee, *v.*
WILBUR N. HILLIARD, Petitioner-Appellant.

First District (3rd Division)   No. 80—477

Opinion filed October 13, 1982.

James J. Doherty, Public Defender, of Chicago (Frances Sowa, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE WHITE delivered the opinion of the court:

This case is before this court for the second time. In our prior opinion (*People v. Hilliard* (1978), 65 Ill. App. 3d 642, 382 N.E.2d 441), we held that Wilbur Hilliard's petition under section 72 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 72, now codified as Ill. Rev. Stat. 1981, ch. 110, par. 2—1401) should not have been dismissed without an evidentiary hearing on the validity of the recantation by the key prosecution witness. We also expressly held that we were not ruling on the other issues raised by Hilliard's direct appeal from his murder conviction and his appeal from the dismissal of his petitions for section 72 and post-conviction relief, which were consolidated by this court prior to our earlier opinion. We reserved ruling on them until the evidentiary hearing had been completed. On remand, an evidentiary hearing was held, and Hilliard was denied relief. He now appeals from that order, contending that the trial court's refusal

to grant relief was contrary to the manifest weight of the evidence. In this opinion we address that issue and the remaining issues from the earlier consolidated appeal.

At the evidentiary hearing the State's primary witness, Johnny Obie, Hilliard's minor stepson who had recanted his trial and grand jury testimony, testified that he had lied in his previous testimony when he said that Hillard woke him at their home on the morning of March 16, 1974, and told him that he (Hilliard) was going to kill a man in the basement, and that he lied when he testified that he watched as Hilliard stabbed the man in the basement. Johnny was the State's only eyewitness. The trial judge correctly stated after the post-conviction hearing that the only issue which he had to determine was whether or not Johnny lied at Hilliard's murder trial. If he did lie, there was no question that the lies contributed to the guilty verdict. At trial the boy's account of the stabbing was bolstered by testimony relating to a knife in evidence. Johnny testified that after Hilliard told him he was going to kill the man, his stepfather went to the pantry and got the knife with which he did the stabbing. He testified that after the stabbing Hilliard and he went through a gangway and through an alley to a place where defendant threw the knife on a roof. Later when Johnny spoke to the police he told them about the knife and showed them where defendant threw it. At the post-conviction hearing Johnny testified that he also lied in this part of his trial testimony. He never saw his stepfather get a knife from the pantry, and a couple of weeks after the victim's body was found in the basement he saw the knife which was on a roof but could be seen from the street. This is the knife he pointed out to police officers. Johnny said his reason for lying to the grand jury and at trial was that his mother told him to do so. At the post-conviction hearing Hilliard's mother testified that Johnny's mother, Hilliard's wife, admitted to her that she told Johnny to lie.

A prosecutor at Hilliard's trial and two police officers involved in the investigation of the killing also testified at the evidentiary hearing. The prosecutor testified that Johnny never gave him any kind of problem as a witness and that he did not threaten Johnny or his mother. One of the officers also testified that he never made any threats to Johnny's mother and that she was not threatened by anyone in his presence.

The results of a polygraph examination taken by Johnny were also admitted into evidence at the evidentiary hearing. The conclusion of the examiner was that Johnny did not tell the truth in response to the following three questions:

"Q. Did you see your stepfather take the knife from the drawer?

A. No.

Q. Did you see your stepfather throw the knife on the roof?

A. No.

Q. Do you believe your stepfather stabbed the man?

A. No."

There was no indication of deception as to the following response:

"Q. Did you see your stepfather stab the man?

A. No."

At the conclusion of the evidentiary hearing the trial judge was of the opinion that Hilliard had not met his burden of showing perjury. He specifically noted that Johnny was "still lying at this point in time, even on the lie detector test." Accordingly, the trial court entered an order denying section 72 relief.

The only issue presented on appeal from this order denying relief under section 72 is whether such denial was contrary to the manifest weight of the evidence. We conclude that it was not.

Several Illinois Supreme Court cases involving petitions for relief under section 72 have stated that in order for a conviction to be disturbed on the basis of perjured testimony, the defendant must show by clear and convincing evidence that the claimed perjured testimony was not merely false, but was knowingly and purposely falsely given. (*People v. Bracey* (1972), 51 Ill. 2d 514, 519, 283 N.E.2d 685; see *People v. Jennings* (1971), 48 Ill. 2d 295, 299, 269 N.E.2d 474; *People v. Lewis* (1961), 22 Ill. 2d 68, 71, 174 N.E.2d 197, *cert. denied* (1961), 368 U.S. 876, 7 L. Ed. 2d 77, 82 S. Ct. 124, *overruled in part by Bracey*.) If this burden is met, then the State has the burden of establishing beyond a reasonable doubt that the perjured testimony did not contribute to the verdict. (*People v. Bracey* (1972), 51 Ill. 2d 514, 520.) Like the judge below, we do not reach the latter "harmless error" inquiry, because we are of the opinion that the trial court did not err in holding that Hilliard did not establish the use of perjured testimony.

Before determining the propriety of the denial of relief, we must determine whether it was appropriate for the court below in arriving at this decision to consider the results of a polygraph examination taken by Johnny. This court, in its prior opinion, specifically stated that it was not deciding the question of the admissibility of polygraph results. (65 Ill. App. 3d 642, 646.) The issue of the admissibility of such results was raised, however, in the briefs in the first appeal, and the issue should be resolved.

Neither party cites us to any Illinois case addressing the question

of the admissibility of polygraph results at a post-conviction hearing, and our research has disclosed no such case. It is well established in Illinois that the results of a polygraph examination cannot properly be introduced as evidence of either the guilt or innocence of the accused. (*People v. Baynes* (1981), 88 Ill. 2d 225, 238, 430 N.E.2d 1070; *People v. Nicholls* (1970), 44 Ill. 2d 533, 539, 256 N.E.2d 818; *People v. Zazzetta* (1963), 27 Ill. 2d 302, 306, 189 N.E.2d 260.) In *Baynes*, the court specifically found that polygraph evidence is not reliable enough to be admitted at trial, even if the parties stipulate that the results of such an examination would be admissible. (88 Ill. 2d 225, 244.) This prohibition against the use of polygraph evidence at trial extends to both examinations taken by defendants (see *Baynes*) and examinations taken by witnesses (see *People v. Vriner* (1978), 74 Ill. 2d 329, 347, 385 N.E.2d 671), and we further observe that our General Assembly has expressed distrust of the reliability of polygraph tests, both in criminal trials and in civil cases. *People v. Triplett* (1967), 37 Ill. 2d 234, 238, 226 N.E.2d 30; Ill. Rev. Stat. 1979, ch. 38, par. 155—11; Ill. Rev. Stat. 1979, ch. 110, par. 54.1, now codified as Ill. Rev. Stat. 1981, ch. 110, par. 2—1104.

But the general rule is not necessarily applicable to a post-conviction proceeding, where the question of guilt or innocence of the person seeking relief is not before the court. Nevertheless, Illinois courts have held that polygraph evidence is not admissible even when no question of guilt or innocence is presented. Thus, in *People v. Ackerman* (1971), 132 Ill. App. 2d 251, 254, 269 N.E.2d 737, the court held that polygraph evidence should not be used at the sentencing stage of criminal proceedings. The court stated: "[T]he use *** of a process which has not been considered a valid method of determining truthfulness would seem to be no more reliable or valid in the sentencing proceedings than in the determination of guilt or innocence." (132 Ill. App. 2d 251, 254-55.) In *People v. Reese* (1980), 90 Ill. App. 3d 284, 290, 412 N.E.2d 1179, the court held that the results of polygraph examinations are not admissible at juvenile transfer hearings.

■ On the basis of these authorities, we feel compelled to conclude that the court below erred when it admitted into evidence the results of Johnny's polygraph examination. Hilliard cites *People v. Barbara* (1977), 400 Mich. 352, 412, 255 N.W.2d 171, 197, which held that a judge in a post-conviction hearing may in his discretion consider the results of a polygraph examination. We are of the opinion, however, that Illinois case law precludes such a holding.

Since the court below also ruled that Hilliard was not entitled to section 72 relief on the basis of Johnny's recantation, even if the poly-

graph results were not admitted, we next address the propriety of that determination.

The credibility of the testimony of the witnesses in a post-conviction hearing is a matter for determination by the trial judge. Unless it can be said that the determination of the trial judge was manifestly erroneous, he will be upheld, since he had an opportunity to see and hear the witnesses. (*People v. Bracey* (1972), 51 Ill. 2d 514, 517; *People v. Bermundez* (1975), 31 Ill. App. 3d 945, 947, 334 N.E.2d 907.) Moreover, several Illinois cases recognize the inherent unreliability of recantation testimony. Thus, in *People v. Marquis* (1931), 344 Ill. 261, 265, 176 N.E. 314, our supreme court stated:

> "Recanting testimony is regarded as very unreliable, and a court will usually deny a new trial based on that ground where it is not satisfied that such testimony is true. Especially is this true where the recantation relied on involves a confession of perjury."

(See also *People v. Bickham* (1974), 23 Ill. App. 3d 1074, 1078, 320 N.E.2d 478.) More recently, in *People v. De Mario* (1969), 112 Ill. App. 2d 420, 425, 251 N.E.2d 274, *cert. denied* (1970), 397 U.S. 1057, 25 L. Ed. 2d 675, 90 S. Ct. 1404, the court stated: "The mere recantation of prior testimony is not even sufficient proof in itself to establish that the earlier testimony was perjured."

Hilliard, however, argues that this is not a case of mere recantation, and that Johnny's testimony at the evidentiary hearing was corroborated by the physical evidence at the trial, and the inconsistencies between his grand jury and trial testimony which are summarized in our earlier opinion. (65 Ill. App. 3d 642, 644.) Hilliard's theory is that the trial evidence supports the recantation because defendant could not have performed the savage attack upon the victim without covering himself with blood, yet there was only one spot of blood on the trousers Hilliard was supposed to have worn during the stabbing.[1]

■ We cannot accept Hilliard's argument. The judge at the evidentiary hearing had the opportunity to see and hear the witnesses testify, and we will not disturb his determination that Johnny's recantation testimony was untrustworthy. In reaching this conclusion we note that that portion of the recantation in which Johnny stated that he saw the knife on the roof "a couple of weeks" after the victim's body was found was inconsistent with the trial testimony of police offi-

---

[1]A microanalyst's report, which was the subject of a stipulation at trial, stated that minute reddish-brown stains were present on the lower right rear leg panel, and that chemical tests yielded positive reactions for the presence of blood.

cers that the knife was recovered six days after the body was found.[2] After reviewing all of the evidence including Johnny's trial testimony and his recantation, the trial judge said, "On the finding of fact, there is no question that John Dwaine Obie is lying. The question is when?" On this state of the record we cannot say that the judge erred in finding that Hilliard failed to establish by clear and convincing evidence that Johnny's trial testimony was perjured. This conclusion disposes of Hilliard's claim of perjury under both section 72 of the Civil Practice Act and under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1979, ch. 38, par. 122—1 *et seq.*).

We next address the questions presented by Hilliard's direct appeal. He first contends that he was not proved guilty beyond a reasonable doubt because the testimony of Johnny and Mary Hilliard was incredible. We, in fact, characterized Johnny's testimony as "unusual" in our earlier opinion. 65 Ill. App. 3d 642, 646.

In addition to the trial testimony of Johnny Obie that on the morning of March 16, 1974, he saw Hilliard stabbing the man in the basement of their home located at 7933 South Parnell Street, the State introduced the following evidence. Robert Beard, a CTA bus driver, identified photographs of Hilliard and the victim at trial. He testified that Hilliard boarded the bus he was driving on 43d Street at approximately 2 a.m. on March 16, 1974; that the victim boarded the bus shortly thereafter; and that both of them exited the bus at the end of the line. Beard had conversed with Hilliard on the bus, and Hilliard had told him that he had recently moved to 79th Street and Parnell. Chicago Police Officer William Mosher, who observed the body of the victim in Hilliard's basement on March 16, 1974, and Dr. Tae An, a coroner's pathologist, testified to the numerous wounds on the victim's body. Mosher also testified to the recovery of the knife from a rooftop. Dr. An testified that in his opinion the cause of death was a stab wound to the chest and that the knife recovered from the roof could have produced the stabbing and cutting wounds on the victim's body. Mary Hilliard, Hilliard's wife, testified that at approximately 4 or 5 a.m. on March 16, 1974, Hilliard arrived at their home. He asked her to get two sheets for a friend who was in the basement. She did so, and Hilliard went out the back door toward the basement, returning about 15 minutes later. Later that morning, Hilliard and Johnny Obie left the house for a period of time, and when Hilliard returned, he told her that he had found a dead man in the basement.

[2]We note that defense counsel attempted to rehabilitate Johnny and that Johnny testified later that he was not sure that he saw the knife on the roof weeks later.

Mary Hilliard also testified that before the police arrived at their home on March 16, 1974, Hilliard told her that he arrived home about 2 a.m. on March 16, and that she should not mention the sheets or his friend in the basement or he would kill her. When the police arrived, she told them that Hilliard arrived home at 2 a.m. She did not tell them about the sheets.

Hilliard testified to having ridden on certain buses during the early morning hours of March 16, 1974. He rode on a 43d Street bus, but said Beard was not the bus driver, and he did not exit at the end of the line. Shortly after he arrived home, he went to bed. At approximately 6 a.m., his wife woke him and said that their two dogs were barking and fighting in the basement. Hilliard went to the basement and saw the victim's body. He had never seen this person before. Hilliard denied that he took any sheets to the basement or that he told his wife a friend would stay overnight in the basement, or that he asked his wife for any sheets.

On the basis of this evidence, the jury concluded that Hilliard's guilt had been established beyond a reasonable doubt. This court will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) The jury believed the evidence presented by the State, and that evidence was not so improbable as to warrant reversal.

■ In arguing that there was insufficient evidence of guilt, Hilliard notes that his counsel was not permitted to ask Mary Hilliard whether she was pregnant at the time of trial, which was approximately 10 months after Hilliard's arrest. Determining the scope of cross-examination is primarily the responsibility of the trial judge. We agree with Hilliard that this appears to be a proper subject of cross-examination, because it tends to indicate bias or a motive to testify falsely. However, we are of the opinion that this restriction of cross-examination did not contribute to the verdict. Mary Hilliard had testified several times on cross-examination that she feared her husband, and thus, by her own testimony admitted motive to testify falsely.

Hilliard next contends that several instances of prosecutorial misconduct deprived him of a fair trial. First, he points to three segments of the State's cross-examination of him. In the first segment, Hilliard was repeatedly questioned regarding whether he had testified on direct examination that the police arrived at 9 a.m. on the day the body was found, when Hilliard had in fact testified that nine police officers came to his home that morning. In the second segment, Hilliard

was asked a question which assumed that he on direct examination had testified that he had told no one about knives on the roof when in fact, he had testified he had shown them to his wife. Hilliard answered that he had not told anyone other than his wife, but later said that he could not answer the question. In the third segment, Hilliard was cross-examined as to whether he found the knives in the basement on the day after the body had been removed or the day after that. It appears that the first segment of cross-examination relied upon by Hilliard was the result of an unintentional misstatement by the prosecutor. In any event, we are of the opinion that none of these alleged errors, when viewed in the context of the entire trial, was of such a prejudicial nature as to require a new trial.

■ Secondly, Hilliard contends that he was denied a fair trial when the prosecution, in its cross-examination of him, made an insinuation prejudicial to him and then failed to present impeaching evidence in response to his specific denial of such insinuation. On cross-examination, Hilliard testified that while riding the Cottage Grove bus on the early morning hours of March 16, 1974, he fell asleep and that when he awoke his coat and wallet were missing. He reported this to the bus driver, who was white. The prosecutor then asked Hilliard questions concerning whether the police had ever told him that there were no white bus drivers working the Cottage Grove route on the night in question and whether police showed him information indicating that he had not filed a report about this incident. Hilliard denied ever having been told or shown such information. Later, when the prosecution presented rebuttal testimony, police officer McKenna testified that he told Hilliard that he had checked with CTA authorities as to whether there was a white bus driver on the Cottage Grove route on March 15 and 16. The State never called a witness who testified that there were not any white bus drivers on that route on those days or that CTA officials had not received a report of Hilliard's loss. Hilliard relies upon *People v. Nuccio* (1969), 43 Ill. 2d 375, 381, 253 N.E.2d 353, which held that it was improper for the prosecution to make unsupported insinuations of misconduct on cross-examination without producing supporting evidence in response to denials of misconduct. Here, the questions did not insinuate misconduct on the part of Hilliard. Moreover, the complained-of cross-examination consisted of only three questions and not a "persistent course of [improper] cross-examination," as was the case in *Nuccio*. (43 Ill. 2d 375, 381.) We find no reversible error.

■ Thirdly, Hilliard contends that prejudicial error occurred when the prosecution asked Hilliard on cross-examination why he had

stabbed a sleeping man, although objections to similar questions had already been sustained. An objection to this question was sustained, and in our opinion, the prompt action of the trial judge cured any error.

■ Hilliard next argues that he was denied a fair trial by improper remarks made by the prosecutor during closing argument. He, however, failed to object to these remarks during argument, and therefore, any error is deemed waived. (*People v. King* (1977), 66 Ill. 2d 551, 559, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273.) As to his contention that the prosecutor misstated the evidence by stating that there was blood on the knee area of his trousers, when the parties had entered into a stipulation that there was blood on the lower portion of the leg of the trousers, we note that the jury was given an instruction informing it that closing arguments are not evidence and that arguments not based on the evidence should be disregarded. We further note that Hilliard, himself, testified that he was wearing the trousers when he cleaned the basement, and that this could explain the presence of blood on them. Improper comments by a prosecutor during closing argument do not constitute reversible error unless they result in substantial prejudice to the accused. (*People v. Nilsson* (1970), 44 Ill. 2d 244, 248, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881.) We conclude that the prosecution remarks at issue were not a material factor in Hilliard's conviction, and therefore, not reversible error.

Hilliard's last argument in his direct appeal is that error occurred when six photographs of the deceased were admitted into evidence. Three of the photographs depicted the appearance of the victim's body from different locations in the basement. Two provided a closer view of his wounds, and the last showed a wound on the victim's face. The State responds that any error was waived by Hilliard's failure to object either during trial or in his motion for new trial to the admission of these photographs, and that, in any event, no prejudicial error is involved.

■ Where photographs are relevant to establish any fact in issue, they are admissible in spite of the fact that they may be of a gruesome nature. (*People v. Foster* (1979), 76 Ill. 2d 365, 377, 392 N.E.2d 6.) In determining whether to admit such photographs into evidence, a trial court should balance their probative value against their prejudicial effect, and its decision will not be reversed absent an abuse of discretion. (*People v. Foster* (1979), 76 Ill. 2d 365, 378; *People v. Hicks* (1981), 101 Ill. App. 3d 238, 242, 427 N.E.2d 1328.) Here, the

photographs were probative of the manner and cause of death, the means used, and the location of the events in question. We find no error in the admission of the photographs into evidence.

The two remaining issues, which were reserved in our earlier opinion, arise out of the first denial of post-conviction relief in the court below. In his petitions for relief, Hilliard asserted that he was entitled to relief under the Post-Conviction Hearing Act because, *inter alia*, he had been deprived of a fair trial by the misconduct of the prosecution and because he had been deprived of due process of law because of ineffective assistance of his trial counsel.

With regard to Hilliard's claim that prosecutorial misconduct deprived him of a fair trial, we observe that he bases this claim upon the same arguments raised in his direct appeal. He, however, expands on his argument concerning the impropriety of the prosecutor's closing argument comment that there was blood on the knee area of defendant's trousers, by relying on the report of a microanalyst. This report was the basis for the stipulation at trial that there was blood on the lower portion of the leg of the trousers, but it was not admitted into evidence at trial. It stated that minute reddish-brown stains were present on the lower right rear leg panel, and that chemical tests yielded positive reactions for the presence of blood. We have already concluded that the prosecution's comment was not a material factor in Hilliard's conviction, and we are of the opinion that this holding and the holdings on the other prosecutorial errors raised on direct appeal are dispositive of this issue.

■■ Hilliard also alleged in his petitions that he was denied effective assistance of counsel at his trial. The State initially responds that Hilliard had waived his right to raise the issue of competency of counsel in his post-conviction petition because he failed to raise that issue in his direct appeal. The State cites *People v. Walker* (1972), 6 Ill. App. 3d 909, 286 N.E.2d 812, a case in which a defendant, during the pendency of his appeal from his conviction, filed a petition seeking post-conviction relief, and relies specifically on the following language therein: "[W]here a direct appeal from a conviction has been taken, a defendant cannot raise in a post-conviction petition those issues which were or could have been reviewed in the direct appeal [citations], unless it is fundamentally unfair to prevent a consideration of the issue." (6 Ill. App. 3d 909, 911.) Hilliard replies that the circumstances of this consolidated appeal do not support a finding of waiver. He notes that this court stayed oral argument in the direct appeal pending resolution of the first post-conviction proceedings, and that this court consolidated Hilliard's direct appeal with his appeal from the

first denial of post-conviction relief. Therefore, he contends it would be ludicrous to require appellate counsel to file a supplemental brief on direct appeal raising this issue, when in fact he has already succeeded in getting all of the issues before the appellate court in consolidated appeal. Under the circumstances, we believe the issue was not waived. However, we are of the opinion that Hilliard was not denied effective assistance of counsel.

Hilliard was represented at trial by privately retained counsel. A defendant's representation will be held constitutionally deficient, "if his counsel was 'actually incompetent, as reflected in the performance of his duties as trial attorney, and if the incompetence produced substantial prejudice to the defendant without which the result *** would probably have been different.'" (*People v. Talley* (1981), 97 Ill. App. 3d 439, 442-43, 422 N.E.2d 1084; see also *People v. Nelson* (1982), 106 Ill. App. 3d 838, 842, 436 N.E.2d 655.) Competency is determined from the totality of counsel's conduct at trial, and a defendant is entitled to competent, not perfect, representation. (*People v. Nelson* (1982), 106 Ill. App. 3d 838, 842; *People v. Talley* (1981), 97 Ill. App. 3d 439, 446.) And "[s]ubstantial prejudice is not established by mere conjecture or by second-guessing counsel's trial tactics." *People v. Nelson* (1982), 106 Ill. App. 3d 838, 842.

Hilliard bases his claim of ineffective assistance of counsel on several instances of alleged incompetence. We address his major contentions briefly.

First, he contends that his trial counsel failed to perfect the impeachment of Johnny by having the transcript of his grand jury testimony admitted into evidence, after Johnny had responded that he did not remember several of the questions asked of him and the answers given by him before the grand jury. If a witness fails to recall making a prior statement, it is incumbent upon the examining party to offer evidence of that statement. (*People v. Purrazzo* (1981), 95 Ill. App. 3d 886, 896-97, 420 N.E.2d 461, *cert. denied* (1982), 455 U.S. 948, 71 L. Ed. 2d 661, 102 S. Ct. 1448.) This was not done here. We observe, however, that defense counsel, during his cross-examination of Johnny, quoted at length from the grand jury testimony, and that defense counsel was permitted to argue the inconsistencies between Johnny's grand jury and trial testimony to the jury. Under these circumstances, we cannot find substantial prejudice to Hilliard.

Secondly, Hilliard argues that his counsel was incompetent because he failed to object to bus driver Beard's identification of a photograph of Hilliard at trial despite the fact that Beard never made an in-court identification of Hilliard. We note that Beard's identification

of Hilliard's photograph was corroborated by his testimony that the black man on the bus had told him that he had recently moved to 79th and Parnell Streets and by the evidence that Hilliard lived at 7933 South Parnell. In the light of this corroboration, defense counsel may have made a tactical decision not to pursue further identification before the jury of Hilliard by Beard.

Thirdly, Hilliard contends that his trial counsel's incompetence was shown by his failure to object to the prosecution's closing argument comment that there was blood on the knee area of Hilliard's trousers and by his failure to object when the prosecution attempted to impeach Hilliard by asking him if police officers had told him that there were no white bus drivers working the Cottage Grove route on the night in question. We addressed these issues earlier in this opinion and found that they did not warrant a reversal of Hilliard's conviction. Accordingly, we find that counsel's failure to object to the comment and the cross-examination did not cause substantial prejudice to Hilliard.

Lastly, Hilliard contends that his trial counsel's incompetence was demonstrated by his failure to raise the privilege afforded marital communications with regard to certain testimony of Mary Hilliard against her husband. Hilliard specifically refers to Mary's testimony that he asked her to get two sheets for a friend in the basement, her testimony that he told her to tell the police that he had arrived home at 2 a.m., and her testimony that he told her not to tell the police about the sheets and his friend in the basement, or he would kill her.

Pursuant to Illinois statute, in criminal cases neither spouse may testify concerning any communication or admission made by either of them to the other, or as to any conversation between them during marriage, subject to certain exceptions not relevant to this case. (Ill. Rev. Stat. 1975, ch. 38, par. 155—1.) And a statement made in private by one spouse to the other is presumed to be confidential, unless the contrary is evident. (*People v. Burton* (1972), 6 Ill. App. 3d 879, 887, 286 N.E.2d 792, *cert. denied* (1973), 411 U.S. 937, 36 L. Ed. 2d 399, 93 S. Ct. 1919.) Thus, it appears that had defense counsel raised the marital privilege, portions of Mary Hilliard's testimony would have been excluded. We note, however, that Johnny, not Hilliard's wife, was the critical prosecution witness at trial, and we are unable to conclude that defense counsel's failure to raise the marital privilege constituted such incompetence as to require reversal of Hilliard's conviction.

We also observe that defense counsel vigorously cross-examined prosecution witnesses, especially Johnny and Mary Hilliard, and

that he made a clear and logical, albeit unsuccessful, closing argument. Viewing the totality of counsel's conduct at trial, we are of the opinion that Hilliard was not denied effective assistance of counsel. Therefore, we conclude that the court below did not err in dismissing the allegations of Hilliard's post-trial petition concerning prosecutorial misconduct and ineffective assistance of counsel.

Accordingly, Hilliard's conviction of murder and the denial of post-conviction relief are affirmed.

Affirmed.

McNAMARA and RIZZI, JJ., concur.