THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LEE OTIS GRIFFIN, Defendant-Appellant.

Fifth District   No. 82—319

Opinion filed May 14, 1984.

WELCH, P.J., dissenting.

David C. Hoffman, of Ripplinger, Dixon & Hoffman, of Belleville, for appellant.

John Baricevic, State's Attorney, of Belleville (Stephen E. Norris and Raymond F. Buckley, Jr., both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE KARNS delivered the opinion of the court:

Lee Otis Griffin and Jimmie Lee Smith were convicted by a jury of three counts of murder and one count of armed violence. Griffin was sentenced to three concurrent terms of 40 years for the murder convictions and one concurrent term of 30 years for the armed violence conviction. Smith was sentenced to three concurrent life terms and one concurrent term for 60 years. Smith and Griffin jointly appealed from their convictions. (*People v. Griffin* (1984), 124 Ill. App. 3d 119.) Griffin also appealed from the denial by the circuit court of St. Clair County of his post-conviction petition alleging a denial of effective assistance of counsel and his post-trial petition to set aside the conviction because the State's key witness perjured himself. Although our separate opinion on the direct appeal by Smith and Griffin set out the facts leading to their convictions, our consideration of Griffin's separate appeals must begin with a fuller factual statement.

About 5:30 p.m. on February 5, 1981, in an apartment in East St. Louis, four people were repeatedly shot. One of the victims, Charles Kellick, feigned death and lived to testify as the State's key witness. Another, Ron Walker, lived long enough to tell the story of the attack on him to three witnesses, each of whom heard something different. The other two, Charles Sims and Christi Smith, provided no clue to the events leading to their deaths. Within hours of the shooting, Lee Otis Griffin was arrested for the murders. A few days later Jimmie Lee Smith gave himself up. A third man, Will Hudson, was never located. No guns were recovered. Griffin's red and white Cadillac, seen at the apartment house, was eventually found abandoned. No fingerprints or other physical evidence was offered to connect it with the killings.

Griffin originally retained Ralph Derango to represent him. They had one conference which lasted about an hour. Following that conference, Derango talked with L. C. Moore, the investigating officer. From Derango Moore learned that Griffin denied doing any of the killing but that he could identify those involved. The information passed on by Derango confirmed Moore's identification of those involved. When Moore served a warrant on Griffin in jail, Griffin again denied that it was "his idea to kill anyone." It was Moore's opinion, based on his knowledge of Smith, that Smith would leave no living witnesses.

Jimmie Lee Smith was arrested several days later and was represented from the beginning by Marvin Goldenhersh. After Griffin's family discharged Derango, Goldenhersh undertook the joint representation of Griffin and Smith. He received a copy of the grant jury proceedings in which Griffin's earlier actions and statements were reported along with Moore's opinions.

On May 5, 1981, at a hearing on a defense motion for a continuance, defense counsel reported that he spent the entire previous day with both his clients in case the continuance should not be granted. The court probed for the possibility of a conflict in the joint representation, but it is clear from the record that counsel at no time during his joint representation of Smith and Griffin recognized any conflict of interest sufficient to require his withdrawal. In response to a direct question from the court, counsel replied, "There is no conflict, Your Honor." Motions for the severance of the trials of the two defendants stated only that each would be prejudiced by admissions made by the other which the customary instructions would not cure and that Griffin would be prejudiced if tried with a codefendant who could not testify because he had a "substantial criminal record." Counsel's argument for the motions to sever led the court to question him closely about the firmness of the proposed alibi defense. The court reminded him that it would not permit "any admission by Lee Otis Griffin that he and Jimmy Smith were in there together." The court asked whether counsel was "saying that the defendant who made admissions against interest now comes up with an alibi defense." Counsel answered that although there were no admissions that Smith and Griffin acted in concert, "[t]hey were either in this together, or they weren't." Prior to jury selection, the State's Attorney again questioned whether, in light of discovery provided by his office and counsel's own interviews with the defendants, the defense was aware of a possible antagonism between the defenses of Griffin and Smith. No further reference to a conflict was made at trial.

The alibi defense offered at trial linked the defendants together during most of the day on which the murders occurred. Griffin testified that Smith came to work in the Griffin family's furniture store at 11 a.m. and they were together there until 3:30 p.m., when they left together to run personal errands. They were in Easton's Tavern from about 5 p.m. until just before 7 p.m. Griffin testified that he left his red and white Cadillac at the store and drove a black and white Maverick borrowed from his sister-in-law. After leaving Easton's Tavern, Griffin returned alone to his sister's house where he met a friend and sat with her in her car. Defense witnesses confirmed Griffin's version of the alibi, but the prosecution's cross-examination underscored various inconsistencies and improbabilities in their stories.

Identification of those responsible for the shooting was the central issue at trial. Three eyewitnesses, each of whom was able to see only a part of the events leading to the shooting, provided conflicting testimony as to who was in the apartment at any given time, who was armed, and who actually did the shooting.

Charles Kellick was the State's key witness. In reciting the events leading up to the shooting, Kellick said he had picked up Velma Robinson and Charles Sims and they all agreed to go to Christi Smith's apartment. Kellick drove the three of them there in his truck which he parked in front of the apartment house. Sims went up to the building alone but returned to say he heard Christi crying inside. Kellick then went with Sims into the building and then into the apartment where they found only the girl and a man in the bathroom. Kellick identified the man as Griffin. Two men walked in behind Kellick. He thought one of them had a revolver. As Sims stepped toward the girl, Griffin shot him. Kellick did not see the weapon or which hand the weapon was in. After Sims was shot, Kellick pushed the two men down and ran to the front door of the apartment. As he put his hand on the knob he was shot in the back of the head. Smith then walked up to Kellick and shot him in the face. Smith kicked him and left him to die. Kellick pretended to be unconscious but eventually was able to crawl into a hiding place under the steps.

Kellick was able to recognize Griffin and Smith because he had seen them a few weeks before the shooting near a house where he dropped Christi Smith off. He had once gone to Griffin's store to buy some beds. When Officer Thurman questioned Kellick at the hospital, Kellick said he did not know who did the shooting. Three days later he identified Griffin in a video lineup presented at the hospital. Five days later he identified Smith's photograph. Kellick remembered seeing a red and white Cadillac behind his truck as he started toward the

apartment. He could not say whether it had pulled up after he did or was already there.

Kellick's prior statement was read to the jury. In it he said that the girl was sitting in the bathroom and Griffin was with her and that two black men were standing by the door. He recognized them because he had seen them before with Griffin. He had seen Smith five times and Will Hudson at least once. Kellick admitted that the statement might not have been completely accurate because it was taken just after he had undergone surgery. After he was released from the hospital, Kellick learned from street contacts and a police officer that the house where had seen Griffin, Smith and Christi was considered a dope house.

Kellick admitted that he had been convicted twice, once for burglary and once for escape from the St. Clair County jail where he had been held for murder, and that he was presently under indictment for the theft of a truck. His trial for theft had been continued until after the murder case was completed. He denied that he had made any deal with the State regarding his testimony.

Velma Robinson, a passenger in Kellick's truck, confirmed his account of a red and white Cadillac behind the truck and two men entering the building after Kellick and Sims went in. She saw the car pull up slowly after Kellick parked. Two men got out, one of whom she recognized as Griffin. They went in. She heard one shot a few seconds after the two men went in. The same two came out and got in the car, which they pulled up in front of the truck and parked for five minutes. They then drove around the corner and five minutes later went back into the building after Ron Walker, another victim, had gone in. She heard another shot. She drove off to get the police. On cross-examination, the defense established that the lighting was good and she was sure she had seen Griffin get out of the Cadillac. Her trial testimony was more detailed than her statement to the police in which she had said she heard two shots five seconds apart, omitting any reference to the Cadillac or the two men.

Ron Walker, whom Robinson had seen enter the apartment house, was shot five times but managed to get to a nearby grocery store. He stumbled in just as Darrell Rice, an Illinois State trooper, and Lionel Settles, an East St. Louis policeman, were talking. David Winchester, assistant manager of the store, came up just after Walker arrived. All three men agreed that Walker identified some of those involved, but they differ on exactly what he said. Over defense objections, the court admitted Walker's statements as dying declarations. Settles testified that Walker said "Lee" had shot him and further identified "Lee" as

a man he had previously seen hanging around a furniture store. Settles asked Walker about the other assailant and Walker identified him as Rush City Jimmy, the owner of the furniture store. Settles later testified that Walker identified "Lee" as the owner of the store and Rush City Jimmy as the one who killed the girl. Although Settles did not then know who Rush City Jimmy was, he understood two men were involved.

While Settles was out of the room where Walker had been taken, Rice heard Walker say that Rush City Jimmy killed the girl but that the person who shot him was "Lee's friend." Rice understood that Walker "was shot as he entered the apartment by the subject already inside the apartment." Winchester came into the room in time to hear some comment about someone who owned a furniture store but did not hear Walker identify who had shot him. He agreed that Rush City Jimmy was named as the girl's killer. Winchester and Rice also agreed that Walker identified a red and white Cadillac as the car in which the attackers fled.

Although Winchester's original statement reported Walker saying there were three men inside the apartment, "the guy that owns the furniture store and his friend, and another, the light-skinned dude," Winchester later testified that the "light-skinned dude" was the same as the storeowner and that only one man was inside the apartment with a gun. Another version of the story offered to the grand jury had Walker saying he had been shot by two people and that two people met him at the apartment door. Walker said he went into the apartment where he saw two bodies on the floor, one of them the girl's. Police found her body on the steps outside the apartment leading to the front entrance.

In defense counsel's closing statement, he made much of the ambiguities and inconsistencies in the testimony of Walker, Robinson, and Kellick. He attempted to discredit Kellick and Robinson's identifications of Griffin as police-inspired cover-ups. He accurately pinpointed the impossibility of both Kellick and Robinson being correct about when Griffin was present in the apartment. He did not point out that the jury might infer from Robinson's account that Griffin was on a somewhat different footing with regard to the flow of events than the first man in the apartment, who apparently stayed there through the whole affair. Defense counsel pointed out the considerable inconsistencies in the reporting of Walker's declarations. He did not, however, point out the disparity between the certain identification of Rush City Jimmy and the uncertainty of Walker's identification of the man who shot him and whether there were one, two, or

three men in the apartment when he was shot.

After seven hours of deliberation, the jury returned a verdict of guilty against both defendants. The post-trial motion for a new trial was denied. Nothing was offered by the defense by way of mitigation at the sentencing hearing. Defense counsel informed the court that both defendants agreed to accept the court's view of their prior records.

On March 18, 1982, Derango again represented Griffin on a petition to set aside the judgment or to grant a new trial (Ill. Rev. Stat. 1981, ch. 110, par. 72) on the ground that Charles Kellick had perjured himself to gain leniency on a charge of stealing a truck. Derango pointed out that Kellick's identification of Griffin as the man already in the apartment with the girl was directly contradicted by Robinson's positive identification of Griffin as one of two men entering the building behind Kellick and Sims. Kellick's son, Scott, swore that his father had joked about the trial and based his identification of Griffin on information supplied by the police. Scott's affidavit was attacked as insufficient because it was unverified, based on hearsay, and notarized by Derango, the attorney of record. Scott testified that he had signed the affidavit because he had expected to obtain an early release from prison. He was later permitted to testify to overhearing his father say his identification of Griffin was based on police information rather than his own knowledge and that he expected to get probation. The elder Kellick denied that he had perjured himself or that he had ever told Scott anything about a deal with the State's Attorney.

The State's Attorney and Kellick's attorney on the theft charge denied that any bargain had been struck before Kellick testified against Griffin and Smith. The State's Attorney agreed that there had been a general understanding that Kellick's trial would be continued until after he testified. The State was "attempting to elicit the cooperation of Mr. Kellick in the trial of Lee Griffin" and transmitted to Kellick through his attorney that "certainly if he cooperated we would take that into consideration at his trial. And therefore, if his trial was prior to his cooperation, there was no leverage for testimony." The court admitted into evidence a transcript of the court proceedings on the theft charge against Kellick. Our record does not include the transcript, but it apparently showed that the State recommended probation because Kellick had testified favorably for the State in the murder trial.

Griffin's petition was denied because he failed to carry his burden of showing Kellick's perjury.

On August 4, 1982, Griffin filed a post-conviction petition alleging a denial of his constitutional right to the effective assistance of counsel. (Ill. Rev. Stat. 1981, ch. 38, par. 122—1.) Griffin alleged that he was denied effective assistance of counsel because his attorney had a conflict of interest in representing Smith as well as Griffin "which prevented adequate and proper counseling of and representation of [Griffin] before and at trial \*\*\*." Griffin alleged that he repeated to his attorney the account he had originally given to Derango: that he was present at the murder scene but took no part in it and tried to stop Smith from killing Christi Smith. He said counsel rejected this story, advising him that such an admission would convict Smith and make Griffin fully accountable. No mention of Griffin's defense inculpating Smith was made in a motion to sever the trials of Smith and Griffin. Griffin alone testified at trial to the alibi which he and Smith concocted to place both of them in a tavern at the time of the murders.

What occurred between Derango and Griffin and later between Griffin, Smith, and their attorney is presented in the affidavits and testimony offered by Griffin and Derango at the post-conviction hearing on October 12, 1982. Both Derango and Griffin were cross-examined, but their testimony was uncontradicted by affidavit or testimony.

Griffin's testimony confirmed the assertions made in his petition and supporting affidavit. He made one change in the wording of the affidavit, replacing "I arrived after the incident started and do not know when it began" with "I arrived after Jimmy Smith and after the argument had started." Griffin then testified that after his only interview with Derango at which he told of being present at the incident but not participating, he repeated the story to his new attorney. He said counsel then told him that admitting he was there would make him accountable. As the result of a discussion between the defendants and their attorney, Griffin agreed he alone would testify because Smith's record was too damaging to risk his taking the stand. Under cross-examination, Griffin admitted that counsel did not advise him "to come up with an alibi." He testified that he gave up his original intention to say Smith was responsible for the crimes because he "strongly believed" he would convict himself if he stuck to the first story.

Derango testified that he had been hired by Griffin's family and reported in narrative form what he had learned from Griffin during their one interview. Griffin and a friend, Hudson, had come to the apartment house to pick up Smith. Smith and Hudson were armed but

Griffin was not. Griffin had tried to save Christi Smith but "the whole incident proceeded over his objection ***." Derango advised Griffin to offer to testify for the State. Derango made a preliminary offer of assistance to the investigating officer. The offer was not followed up because Derango was discharged by Griffin's family. It was Derango's professional opinion that Griffin had a valid defense based on his original story but that it could not have been presented successfully in a joint representation of Smith and Griffin.

The trial court was unable to determine whether Griffin was telling the truth about what Goldenhersh had been told or had told Griffin. Based on his familiarity with the trial record, the court found that Griffin had been "afforded a defense according to the defendant's own testimony on the stand under oath" and there was "no conflict in the defense between the defendant and his co-defendant." The petition was denied.

The first issue we are asked to decide is whether Goldenhersh's joint representation of Griffin and Smith denied Griffin the effective assistance of counsel guaranteed by the United States Constitution. (U.S. Const., amends. VI, XIV.) Secondly, we are asked to determine whether Griffin was denied a fair trial because Charles Kellick was induced to perjure himself in exchange for favorable consideration by the State with regard to a theft charge pending against him.

The State has provided criminal defendants the device of a post-conviction petition in order that they may raise constitutional questions about their defense. (Ill. Rev. Stat. 1983, ch. 38, par. 122—1.) The post-conviction hearing is a civil procedure, and the defendant has the burden of showing by a preponderance of the evidence that he has been denied a constitutional right. (*People v. Stovall* (1970), 47 Ill. 2d 42, 264 N.E.2d 174, *cert. denied* (1971), 402 U.S. 997, 29 L. Ed. 2d 164, 91 S. Ct. 2183.) The court is to consider the evidence offered at the post-conviction hearing and the trial record together in arriving at its decision. (*People v. Ferrance* (1975), 32 Ill. App. 3d 358, 336 N.E.2d 532.) Its decision will not be disturbed unless it is found contrary to the manifest weight of the evidence in the record as a whole. *People v. Murphy* (1979), 78 Ill. App. 3d 132, 397 N.E.2d 68.

The constitutional interest to be protected in the present case is Griffin's right to the effective assistance of counsel. Consideration of what is meant by effective assistance of counsel most often arises in cases where a trial court has refused to allow separate representation for multiple defendants. Here the court was ready to consider separate representation; no such request was made. This does not mean that Griffin was not entitled to the same full measure of protection

defined in such cases as *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457, and *Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173. In *Glasser* the Supreme Court pointed out that "the sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." (315 U.S. 60, 70, 86 L. Ed. 680, 699, 62 S. Ct. 457, 465.) Where there is a conflict in joint representation it may make itself felt in the attorney's reluctance to challenge evidence which favors one client to the detriment of another or his failure to argue that there are degrees of culpability among multiple defendants. The sixth amendment is not satisfied "when the advocate's conflicting obligations have effectively sealed his lips on crucial matters." *Holloway v. Arkansas* (1978), 435 U.S. 475, 490, 55 L. Ed. 2d 426, 438, 98 S. Ct. 1173, 1181.

It is not enough for a defendant alleging denial of the effective assistance of counsel to point to the fact of joint representation as evidence of a conflict. He must show that an actual conflict of interest existed or became apparent at trial. (*People v. Ballard* (1978), 65 Ill. App. 3d 831, 382 N.E.2d 800; *People v. Thompson* (1977), 51 Ill. App. 3d 53, 366 N.E.2d 375; *People v. Chapman* (1965), 66 Ill. App. 2d 124, 214 N.E.2d 313.) This court will not indulge in mere speculation as to the existence of a conflict which hampered counsel's defense efforts. To do so would invite invention by disappointed defendants (*People v. Coleman* (1980), 85 Ill. App. 3d 1020, 407 N.E.2d 832) or encourage a defense counsel to render deliberately ineffective counsel to provide a second shot for his clients. We see neither invention nor pretended ineffectiveness in this case. We wish to do nothing to relieve a defense counsel of his duty to bring to the trial court's attention any possible conflict at the earliest rather than latest moment. As we have said before, "[t]he primary responsibility rests on defense counsel to take care not to accept or continue the representation of two or more codefendants unless it is clear that there exists no potential conflicts of interest. [Citations.]" *People v. Meng* (1977), 54 Ill. App. 3d 357, 365, 369 N.E.2d 549, 554.

Nevertheless, there may be those circumstances presented in a post-conviction proceeding which indicate that a conflict existed between the interests of codefendants and that defense counsel's performance was affected by it to the detriment of one defendant. In this case, Griffin presents to the court for the first time in the post-conviction proceedings a story which divorces his interests from those of Smith. If Griffin had insisted on testifying that he tried to keep Smith from killing the girl and otherwise objected to the shootings, Golden-

hersh could not have represented him at the same trial with Smith. To attempt it would have meant allowing Griffin to inculpate Smith or cross-examining Griffin in order to discredit him. The trial court clearly foresaw the problem when it advised Goldenhersh it would not permit Griffin to say "he and Jimmy Smith were in there together."

We do not think Griffin's assertions at the post-conviction hearing are inventions. As an admitted perjurer, he would not be easily believed if all he had to offer was his unsupported version of the pretrial events, and we would again emphasize that there is nothing in the trial record that suggests that Griffin ever told his attorney anything other than the alibi advanced at trial in his defense. Derango's affidavit and testimony confirm Griffin's account. Derango's version is in turn supported by the grand jury testimony of L. C. Moore, who reported that he was in fact contacted by Derango, that he understood Griffin would supply identifications of the others involved, and that the information offered matched that already gathered by Moore. Moore testified that Griffin had orally denied responsibility for the killings but that Smith had made no statement. Moore characterized Smith as a man who "doesn't believe in going back to jail; and if it's his thing to kill, kill everybody, leave no witnesses."

The transcript of the grand jury proceedings was provided to Goldenhersh on March 19, 1981, so that it was available as he considered the relative positions of his clients. It showed at least that Griffin's original position communicated to his first attorney was inconsistent with the later alibi defense. We also note that the prosecution's evidence tended to confirm Griffin's original story of his presence, the late arrival of two men, one of whom was armed, and Smith's killing of the girl.

Griffin alleges that he told Goldenhersh the same story he told Derango. Griffin states that Goldenhersh warned him that his suggested testimony would convict Smith and make Griffin fully accountable. Such legal analysis does not take into account the State's burden of proving something more than mere presence in order to make Griffin accountable for the acts of other participants. (*People v. Trapps* (1974), 22 Ill. App. 3d 1029, 318 N.E.2d 108.) Having accepted the view that an attempt to exculpate himself at Smith's expense would backfire, Griffin agreed with Smith to come up with an alibi which Griffin alone would present. The advantages to Smith are clear. He could remain silent and avoid a recitation of his criminal convictions. Griffin, who had no criminal record, could testify to the activities of two working men enjoying their simple pleasures at the time the murders were committed. While it may not be unlikely that Griffin re-

peated his first story, nothing in the record indicates that Goldenhersh was provided any fact inconsistent with the alibi defense.

The decision by one or more defendants to adopt an alibi defense may forestall any finding that a conflict between defendants appeared at trial. It has been held, for example, that one defendant's alibi is not in conflict with his codefendant's confession (*People v. Madison* (1980), 81 Ill. App. 3d 471, 401 N.E.2d 571), that separate alibis which do not inculpate the other defendant show no conflict (*People v. Craig* (1977), 47 Ill. App. 3d 242, 361 N.E.2d 736), and that there is no conflict if inconsistent versions of a shared alibi nevertheless place both defendants away from the crime scene. *People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227.

Nor will conflict be found because hindsight suggests that defense counsel might have chosen a different strategy. In *People v. Echols* (1978), 74 Ill. 2d 319, 327-28, 385 N.E.2d 644, 648, the court refused to find a conflict where there was a "mere possibility that one strategy available to defense counsel would have helped one defendant at the expense of another. [Citations.]" In *Echols* the court found no hostility between the interest of the Echols brothers and codefendant Wilson simply because it was possible that independent counsel could have argued that descriptions of clothing made a substantially stronger case against the Echols brothers than against Wilson. Nor was it enough that Wilson's counsel might have argued that Wilson was unaware that the Echols brothers had placed stolen goods in the car in which they were all arrested. See also *People v. Williams* (1981), 94 Ill. App. 3d 241, 418 N.E.2d 840.

In some instances, however, the choice of treating codefendants differently is more than a mere possibility; it is forced on counsel by the difference in evidence offered against codefendants. For example, in *People v. Echols* (1978), 74 Ill. 2d 319, 385 N.E.2d 644, the State's evidence clearly provided a stronger case against one codefendant than the others. In that case, the defense counsel's decision to draw no distinction between his clients was found to reflect a conflict of interest. In *Echols* three codefendants were represented by a single public defender. During the course of the trial the State offered into evidence a fingerprint found on the door of a tavern the three were accused of burglarizing. The fingerprint was said to match a sample taken from the defendant, Kenneth Echols, but when the police officer was asked to pointed out Echols in the courtroom he pointed to the appellant Wilson. The public defender advised Wilson and Echols to refuse to be fingerprinted to resolve the confusion, although that would have determined that the fingerprint did not belong to Wilson.

In his closing argument, the defense counsel "chose to point to the ambiguity regarding the fingerprints as limiting its probative value relative to all of the defendants, rather than specifically arguing that the print probably did not belong to appellant." (*People v. Echols* (1978), 74 Ill. 2d 319, 325, 385 N.E.2d 644, 647.) Advising Wilson to form a solid front with Echols in refusing to resolve the confusion masked the fact that the "appellant's interests and those of the Echols brothers diverged dramatically. It requires no speculation to reach the conclusion that competent, independent counsel would have advised appellant to resolve that confusion, and would have argued in closing that, on balance, given all of the evidence, appellant never entered the tavern." (*People v. Echols* (1978), 74 Ill. 2d 319, 328, 385 N.E.2d 644, 648.) In short, he would have taken advantage of an unforeseen confusion in the State's case to distinguish one defendant from the others.

In the present case, Griffin and Smith presented a united front at trial. The decision that only Griffin would testify to a single alibi for himself and Smith meant that no conflict would appear in their defensive positions. When the alibi defense proved unpersuasive in the face of the State's eyewitnesses and Walker's dying declarations, defense counsel was left in a difficult situation. He had to counter testimony placing both of his defendants at the scene. As damaging as the State's witnesses were, they were nevertheless inconsistent in their identification of those responsible for specific acts. Robinson, a disinterested witness, flatly and positively contradicted Kellick's identification of Griffin. Walker's dying declaration and Kellick's testimony about Smith left little room for defense maneuvers on his behalf. In order to take full advantage of the inconsistencies in the identification of Griffin, Goldenhersh would have had to distinguish between the uncontradicted assertions that Smith killed the girl and shot Kellick and the uncertanties about the identity of the man in the bathroom who shot Sims and the man or men who shot Walker. As it was, he only pointed to the inconsistencies and ambiguities as matters going to the credibility of the State's witnesses. Counsel could not give Griffin the best possible defense under the circumstances because to do so would have been disloyal to Smith, his original client. Because of this conflict of loyalties, he remained silent when independent counsel would have spoken out on Griffin's behalf. For this reason, we find that Griffin is entitled to a new trial.

An independent basis for granting a new trial is presented in Griffin's appeal from the denial of his motion to vacate the judgment or to order a new trial. In that motion he alleged that Kellick had per-

jured himself. Griffin argued that Kellick's identification of Griffin was false and that he had admitted it to his son, Scott. Griffin also argued that Kellick's denial of any promises or negotiations with the State's Attorney's office regarding the theft charges against him created the false impression that he was an unbiased witness for the State.

■ Griffin fails to provide the clearly convincing evidence necessary to show that Kellick's identification testimony was perjured. (*People v. Hilliard* (1982), 109 Ill. App. 3d 797, 441 N.E.2d 135.) Scott Kellick is too weak a reed to provide any support for an allegation of perjury. His affidavit and testimony were discredited by his admission that he was doing both Griffin and himself a favor by signing the affidavit accusing his father of perjury. The fact that Kellick's testimony is contradicted by that of Robinson is insufficient to prove perjury. Inconsistencies are to be resolved by the trier of fact. *People v. Hoffman* (1970), 45 Ill. 2d 221, 258 N.E.2d 326; *People v. Bolton* (1973), 10 Ill. App. 3d 902, 295 N.E.2d 11.

At trial Kellick created the impression that there was no connection between his testimony and the theft charge pending against him. He testified that he did not know that his case was scheduled for disposition after the murder trial, that he knew of no promises or negotiations concerning his case, and that he had not talked to his lawyer "about it at any time."

At the post-trial hearing a somewhat different picture presented itself. The State's Attorney admitted there was an understanding with Kellick's attorney that the State wanted Kellick's cooperation in the murder trial. The State's Attorney wanted to elicit testimony from him and was holding off on the theft trial in order to maintain "leverage" on Kellick. No leverage would have been possible unless Kellick knew his actions were being watched. Although Kellick denies that his attorney ever told him of the understanding, the State's Attorney had conveyed to his attorney the assurance that his cooperation would be taken into account and it seems unlikely that an attorney would have withheld information about a possible benefit his client could gain through his own action. Moreover, Kellick and his attorney had already received a special permission for Kellick to leave the State on personal business. Kellick admitted that he knew what plea bargaining was and that one did not "give anything without getting something in return."

■ Kellick's testimony was the keystone to the State's case and his credibility was therefore an important issue. The jury was entitled to know of any understanding in order to assess his credibility. It is

not only negotiated promises which may induce bias; expectations or even hopes for leniency may have their effect. (*People v. Bolton* (1973), 10 Ill. App. 3d 902, 295 N.E.2d 11.) It was the State's duty to correct any false impression left by Kellick's flat denial that he expected any consideration from the State. Griffin is therefore entitled to a new trial. *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173; *People v. McKinney* (1964), 31 Ill. 2d 246, 201 N.E.2d 431; *People v. Bolton* (1973), 10 Ill. App. 3d 902, 295 N.E.2d 11.

For all the reasons stated above, the judgment of the circuit court of St. Clair County is reversed and the cause is remanded for a new trial.

Reversed and remanded.

KASSERMAN, J., concurs.

PRESIDING JUSTICE WELCH, dissenting:

I am unpersuaded by the reasoning of the majority, especially in reference to its conclusion that petitioner Lee Otis Griffin was denied effective representation because a conflict of interest existed. The majority holds that Griffin is entitled to a new trial since his attorney, Marvin Goldenhersh, did not vigorously assert that codefendant Jimmie Lee Smith was responsible for the murders in question. The majority's holding is not supported by the record, but is based instead on an improper reevaluation of a credibility issue already resolved below.

Griffin's post-conviction petition alleged that he initially told attorney Goldenhersh that he was present at the scene of the crime, but took no part in the killings. In fact, he alleged that he attempted to stop Smith from committing the murders, but was unable to do so. According to Griffin, Goldenhersh told him that these facts made him guilty on a theory of accountability. Subsequently, Griffin fabricated an alibi, testifying in court that neither he nor Smith was at the scene of the crime. Therefore, petitioner alleged, by testifying to a concocted alibi as a defense, he destroyed a legitimate defense—that he did not kill the victims.

A hearing was held on the petition on October 12, 1982. At that time, the trial court stated that the petitioner was not credible because of his prior perjured testimony. The court stated that it did not know what the petitioner had told attorney Goldenhersh at the outset of the attorney-client relationship, but that there was no conflict in representation at trial in light of petitioner's sworn testimony that he

and Smith were elsewhere at the time of the killings.

In reviewing the denial of the petition, the majority chooses to accept Griffin's version of what transpired between him and attorney Goldenhersh, noting that this version of events "*** was uncontradicted by affidavit or testimony." (124 Ill. App. 3d at 176.) In my mind the majority simply does not come to terms with the obvious fact seen by the trial court: that petitioner was an admitted perjurer. Like the trial court, I cannot accept the petitioner's assertion that he has now seen the light and is telling the truth. Moreover, even if petitioner gave another attorney the version of events that he now claims to be true, this in no way proves that he actually told attorney Goldenhersh the same story.

Another significant inconsistency in the majority's reasoning exists in its evaluation of trial counsel's defense strategy. The majority reasons that the identification of Griffin was tenuous, while testimony of Smith's involvement "*** left little room for defense maneuvers on his behalf." (124 Ill. App. 3d at 181.) The majority concludes that counsel could not provide Griffin with the best possible defense without incriminating Smith, his original client. Given petitioner's sworn testimony at trial that he and Smith were not at the scene of the murders, I believe no actual conflict in representations has been demonstrated. The majority's finding of a conflict presumes a different defense than the one advanced at trial.

The Illinois Supreme Court has stated that where codefendants are jointly represented by one attorney, an actual conflict of interest manifested at trial must be shown for denial of effective assistance of counsel to be established. (*People v. Washington* (1984), 101 Ill. 2d 104.) Despite the majority's contentions to the contrary, I feel this standard has not been met. The defenses presented at trial, although perjured, were not antagonistic or inconsistent. Even the majority points out that Griffin "*** testified at trial to the alibi which he and Smith concocted to place both of them in a tavern at the time of the murders." (124 Ill. App. 3d at 176.) Given Griffin's testimony that he was not at the scene of the crime, I agree with the trial court's determination that no actual conflict of interest manifested at trial was established by the petitioner. The majority's analysis places an unfair burden on trial counsel and may even reward perjury. I would affirm the circuit court's denial of the post-conviction petition.