THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS McMILLAN, Defendant-Appellant.

Fourth District   No. 4—91—0969

Opinion filed January 14, 1993.

468

Costello Law Office, of Springfield (Michael J. Costello, of counsel), for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Norbert J. Goetten, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

Defendant Thomas McMillan was convicted of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)), armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2(a)) and attempt (aggravated kidnapping) (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4(a), 10—2(a)(3)) of Melissa Koontz following a jury trial in July 1991. The jury found defendant eligible for the death penalty but found mitigating circumstances sufficient to preclude a sentence of death. Accordingly, the trial court sentenced defendant to a term of natural life on the murder conviction only. He now appeals, raising four issues regarding errors occurring at trial, the sufficiency of the evidence and the jury instructions. We affirm.

Melissa's mother testified that on June 24, 1989, 18-year-old Melissa left their home in Waverly at approximately 9:45 a.m. to go to work at Cub Foods in Springfield. Melissa was to work two shifts that day and was expected to be home at approximately 11 p.m. She had her own car, a 1988 Ford Escort, which she used to drive back and forth to work. It is approximately 27 miles from their house to Cub Foods. In order to get to work, Melissa took Route 104 to County

Road 15 West, which is between Waverly and New Berlin, over to Interstate 36. Melissa never came home that evening although she had no plans to go out after work. She was last seen alive at Cub Foods by a co-employee at 10:06 p.m.

When she did not come home, Mrs. Koontz woke up her husband and they called Cub Foods to see if Melissa was there. When they were told she was not there, they began to look for her. They followed the route that Melissa would have taken to and from work and they discovered her car on County Road 15 West. Inside the car was Melissa's purse, which contained her identification but no money, her work jacket and a tennis racket. Melissa's car would not start because the battery had run down. At approximately 5 or 6 a.m., Mr. Koontz returned to Melissa's car with his son, and they jump started the car and drove it home. Mrs. Koontz testified Melissa had a 24-inch silver chain hanging over the rearview mirror in her car which she had seen on the Tuesday or Thursday prior to Melissa's disappearance. She identified a chain, plaintiff's exhibit No. 9, as the chain she had seen in Melissa's car. She testified that after Melissa's death, she went through her personal belongings and never found the chain.

Al Sample, a Sangamon County deputy, was working on June 24, 1989, when at approximately 11 p.m., he received a call regarding an abandoned vehicle on County Road 15 West, three miles south of New Berlin. At the time he was in Williamsville, approximately 35 miles away from where the abandoned vehicle was located. He traveled south on I-55, then westbound on Interstate 36 to the New Berlin exit and then on County Road 15 West until he reached the vehicle. At this time, he was driving a brown and white squad car. He traveled approximately three miles on County Road 15 West before reaching the vehicle.

County Road 15 West is a two-lane asphalt road with a relatively narrow shoulder. When he arrived, he found a black Ford Escort stopped in the center of the southbound lane with its headlights on and the doors closed. When he examined the vehicle, he noticed the keys were in the ignition but the engine was off. There was a purse and an item of clothing in the front seat of the car and a tennis racket in the back seat. When he reached the car, he radioed the license plate information to the Sangamon County sheriff's department and requested that they contact the registered owner to find out why the car was on the road at that time of night. He determined that the co-owner of the car was Robert Koontz, Melissa's father. He went through the purse to locate some identification and found Melissa's driver's license.

Approximately one hour later, he was advised that the registered owner could not be contacted, so for safety reasons, he pushed the vehicle off to the side of the road. He checked the immediate area for anybody that might have been the driver of the vehicle. Officer Sample also checked the area north and south of that location using a spotlight he had on his car. He traveled approximately 10 miles up Route 104 to Interstate 36 several times looking for the driver of the car. He did not notice anything unusual about the vehicle other than it was in the roadway. He did not find any blood nor did he find anything to be disturbed in the car. On cross-examination, Sample testified that based on his examination of the scene where the car was found, he saw no signs of a struggle or physical violence.

Paul Schuh, a crime scene technician for the Illinois State Police, went to the Koontz house on June 25, 1989, to process and examine Melissa's car. He found stains on the front of her car but determined that they were not bloodstains. He found a Cub Foods receipt on the floor in front of the passenger seat. He found fingerprints on the outside of the driver's door, on the back exterior of the car, on the inside rearview mirror and the interior surface of the passenger door. None of these fingerprints matched defendant's. Schuh also examined the area where the car was abandoned but found no blood in that area.

Susan Matteson testified that on July 1, 1989, she was taking a drive with her husband on County Road 2 South at approximately 1 p.m. During this drive, she stopped along the road to urinate in a cornfield. She walked toward the cornfield, smelled something and as she looked at the cornfield, she could see the head of a person. She ran back to the truck and told her husband that they should go call the police. She did not actually go into the cornfield but remained at the edge and saw what appeared to be a path into the cornfield. They drove to the nearest farmhouse and phoned the police.

Dr. Grant C. Johnson performed an autopsy on the body of Melissa Koontz on July 2, 1989. He was called to the scene where Melissa's body was found which was approximately 15 feet into the cornfield in Sangamon County. The body was severely decomposed, lying on its back with the head turned so that the right side of the face was in contact with the ground.

Dr. Johnson testified that there were 18 wounds on the chest, back, arms and hands of the body. He explained that this did not count the areas where there was severe decomposition; however, he found 18 clearly demonstrable wounds. Four of those wounds represented exit wounds due to perforation of the body. He estimated that the wounds were caused by a knife which had a blade approximately

three inches long and one inch wide. He characterized this knife as what the common person would think of as a butcher knife.

Dr. Johnson found the heart fairly well preserved but found two defects in the heart which were compatible with stab or cutting wounds. He testified that based on a reasonable degree of medical certainty, the cause of death was hemorrhage, largely due to the penetrating wounds to the heart.

Dr. Johnson also examined Melissa's clothing. Her blouse had four defects which were compatible with the passage of a knife. These were directly over the area of large decomposition on the back of the body. Melissa's bra had a small slit in the upper portion of the left cup and the plastic clasp which holds the bra together was broken. The slit in the cup of the bra was consistent with the passage of a knife; however, Dr. Johnson did not believe the broken clasp was consistent with the passage of a knife. He also examined Melissa's panties and found them in the normal position covering the body. There was a four-inch defect on the right front of the panties which looked like a rip or tear. Melissa had on a skirt and there was a shoe on one foot. The other shoe was found near the body.

At this point of the examination of Dr. Johnson, the prosecutor asked him if he had determined whether Melissa had been raped. Dr. Johnson testified that based on a reasonable degree of medical certainty he found no evidence of sexual assault. Defense counsel objected to this line of questioning stating defendant had not been charged with rape. The trial court sustained this objection.

Dr. Johnson testified that he would not have expected much blood to come out of the chest wounds because once wounds are made in the heart, they tend to quickly close up. With respect to the wounds on the arms, he would expect some blood to be present at the scene, but the length of time the body was in the area would diminish the amount of blood that might be present. He also testified that an instrument penetrating the heart would immediately plummet the blood pressure down to zero, thereby causing very little blood to come from the arms. He stated that the genitals were severely decomposed and because of this decomposition, he encountered considerable and substantial difficulty in analyzing the external genitalia. However, within those constraints, he did not see any clear-cut evidence of injury. Dr. Johnson was unable to determine the time of death; however, he did testify that the condition of the body was compatible with the time between when she was last seen on June 24 and when she was found on July 1.

Despite his objection during direct examination to the line of questioning regarding the possible sexual assault of Melissa, defense counsel questioned Dr. Johnson on cross-examination about the absence of evidence of that crime. Dr. Johnson testified that the tests performed on the body indicated no presence of spermatozoa. He found no evidence of injury to the genitalia but qualified that remark with the constraints created by the decomposition of the body.

Daniel K. Thomas, a resident of Palmyra, testified that on June 24, 1989, he left his relative's house in Springfield at approximately 9:30 p.m. He traveled down Interstate 36 to the New Berlin exit where he turned onto a road commonly known as the New Berlin blacktop. On the west side of the road approximately 10½ miles from the interstate, he saw a light-colored car parked near a grain bin. After seeing this car, he proceeded to travel down the New Berlin blacktop and, as his attention was turned back to the road, directly in front of him was a dark-colored car stopped in the road. The car had its taillights and headlights on but the passenger side door was open and the dome light was not on. Thomas identified a picture of Melissa's car as the same one he saw in the road that evening. He proceeded toward his home in Palmyra and he reached that city at approximately 10:38 p.m. He knew the time because he saw the digital clock of a bank. He estimated it was approximately 20 to 25 minutes between when he saw Melissa's car and when he saw the bank clock. He was driving a red 1989 Camero that evening.

Sim Pocklington testified he was the brother of Mary Pocklington, who resided with defendant at the time of this offense. On June 24, 1989, he went to work and returned home at approximately noon. He ate lunch, watched television and then left his house to go to Mary's house. He arrived there around 7 or 7:30 p.m. Present at that time were defendant, Mary, Jeff Pocklington, Danny Pocklington, Donald Johnston, and Gary Edgington. Danny, Johnston, and Edgington are codefendants in this matter. Sim testified he was at the house for approximately 1½ or 2 hours. He left to go home at approximately 9 p.m. and went to bed at 11 p.m or midnight.

He woke up at approximately 1:30 or 2 a.m. because Mary and Edgington showed up at his house. Later, defendant, Danny and Johnston arrived at his house. Edgington drove his own car there, defendant came in Mary's car and Danny and Johnston arrived on foot. Danny had a red and white handkerchief containing a necklace which he handed to Sim for safekeeping. Sim identified Melissa's necklace as that which Danny had given him that evening. Defendant did not stay very long, and Danny and Johnston stayed approximately

15 minutes. When they left, Danny took the necklace with him stating he was going to give it to his mother.

Nancy Pocklington testified that she was the ex-sister-in-law of Mary and at one point was engaged to Edgington. On June 24, 1989, she was asleep at her home when, sometime after midnight, Johnston and Danny arrived at her house in Carlinville, Illinois. She noticed that they appeared nervous and uptight. They spent the night there and left the next morning at approximately 8 or 9 a.m. She saw what looked like a bloodstain on the front of Danny's shirt. Nancy recalled a conversation, which occurred approximately one week later, between defendant, Mary and Sim. She testified that they said that on June 24, Danny and Johnston arrived on foot at Mary's house and gave Mary and Sim a knife to keep.

David Leonard, a detective with the Sangamon County sheriff's department, testified that Johnston was arrested on July 9, 1989, in Macoupin County for public indecency and theft. At the time he was arrested, Johnston was not a suspect in this case. When he was arrested in Macoupin County, Johnston made the statement that defendant was the one who had killed Melissa. Johnston also implicated himself in that murder.

Johnston was arrested on July 13, 1989, in Sangamon County for Melissa's murder. Johnston took Detective Leonard to the place where Melissa's car was found. Detective Leonard testified it was approximately 16.7 miles from Cub Foods to where Melissa's car was found. He further testified it was approximately three miles from Cub Foods to where her body was found. Finally, Detective Leonard testified it was approximately 16.6 miles from where defendant lived to where the car was found.

Detective Leonard first spoke to defendant on July 20, 1989, in the Macoupin County sheriff's office. He told defendant he was a suspect at this time in this murder and defendant was advised of his constitutional rights. He testified defendant stated that on June 24, 1989, he was at his father's residence and that his father brought him home at approximately 9 or 9:30 p.m. He did not leave his house that evening. Defendant indicated that Danny, Billy Pocklington, and Johnston were present when he arrived home that evening. Defendant told Detective Leonard he sat on the front porch for a while talking to these people and that at approximately 10:30 or 11:30 p.m. he went to bed. Defendant told Detective Leonard that Danny and Johnston stayed at his house and slept outside in the front yard underneath a big tree. Defendant stated that Johnston and Danny were present at the house the next morning when he woke up. Defendant stated he remembered

that day specifically because his father came by that morning and advised defendant that he had become a grandfather. Detective Leonard testified defendant did not own a vehicle but that Mary owned an older, white Chevrolet four-door which was later sold to a junkyard, taken to St. Louis and traded for scrap.

On May 14, 1990, Detective Leonard spoke with defendant at the Sangamon County Building in Springfield. He testified defendant was there because he was under subpoena for Johnston's trial. Johnston had agreed to cooperate with the police and an eavesdrop order was issued to videotape and audiotape the conversation between defendant and Johnston. The purpose of this conversation was an attempt to get defendant to admit his involvement in Melissa's death. Later, Edgington was also allowed to go into the room and talk to defendant and Johnston. During that conversation, defendant continually denied any involvement in the crime. Prior to entering the room, Edgington had confessed to the crime. He also agreed to cooperate with the investigation and attempted to get defendant to admit his involvement in this crime. Edgington, Danny and defendant were arrested on May 14, 1990. They were not arrested earlier because, until Johnston agreed to cooperate and Edgington confessed, the police did not have enough evidence to file any charges against any other suspects.

On July 14, 1989, Detective Kevin Harney spoke with defendant at the Macoupin County sheriff's department. He advised Detective Harney that he had talked with another officer prior to this day and he wanted to set the record straight as to what he actually did on June 24, 1989. Defendant stated that on the morning of June 24, he was at his residence with Mary and Billy. He and Mary got into an argument because Mary was going to see Edgington. Defendant went to his father's house and he arrived there at approximately 3 p.m. Mary had stated she would be back around 6 p.m. to pick him up but when she had not arrived by 7 p.m., he began walking toward his house. As he did, his father drove up and gave him a ride home. When they arrived, Johnston, Billy and Danny were there. Defendant told Detective Harney that it was approximately 11 p.m. when they went to bed. Defendant stated that Billy slept on the couch and Danny and Johnston slept on the floor.

Detective John Pinneo met with Mary on July 14, 1989, at the Macoupin County sheriff's department. Detective Brenda Campbell and Mary were just finishing their interview when Detective Pinneo walked into the room. He asked Mary if there was anything else that they needed to know about this investigation. At that point, Mary reached into her purse and pulled out a necklace. Detective Pinneo

identified the necklace that was previously identified by Mrs. Koontz as the necklace she had seen in Melissa's car as the same necklace that Mary gave him on July 14, 1989. He testified he did not ask anything about this necklace and that Mary produced it on her own.

The State presented testimony of five inmates, all of whom defendant had made admissions to regarding his involvement in this incident. The first, Dexter Huddleston, testified he resided in the Schuyler County jail. Huddleston admitted to three previous felony convictions for which he served two years in the Department of Corrections. He also admitted he was presently incarcerated on charges for home invasion and unlawful use of a weapon by a felon. Huddleston indicated he had an opportunity to be in custody with defendant on June 10, 1990, at which time defendant discussed his case.

Defendant told Huddleston that he and Edgington had decided to rob the first person that came along. He indicated defendant stated they took the victim to a secluded area where they raped and then killed her because she could identify them. Huddleston testified that defendant stated he stabbed the victim twice and that the other stabs were the ones that killed her. Defendant told Huddleston that they placed the girl in a cornfield and that he went back the next day and touched her hand. Defendant was worried about the police because they had gotten a chain back from Mary. Huddleston stated he was not familiar with any of the facts of this case and he had not read any of defendant's documents in this case. He only talked to defendant once about this and then he had himself moved out of the cell block. Huddleston stated he had not been made any promises regarding his pending cases. He was not expecting anything as a result of his testimony but on cross-examination, Huddleston admitted he had not yet gone to trial on his pending charges.

Richard Bottoms testified he was on probation in Logan County, for possession of cannabis. He also had two pending felony driving while revoked cases in Sangamon County. Bottoms was in the Sangamon County jail on June 9, 1990, and approximately four days later, he was in custody with defendant. He testified defendant told him that he had stabbed a lady, that he was sorry he had done that, and that he was trying to figure out a way of getting out of it.

Defendant told Bottoms that Danny, Johnston, and Edgington were present when this crime took place. Defendant indicated they were all drinking that night, had run out of beer money and were on their way to Springfield to get some money. Defendant stated that they were driving down a blacktop road and he knew the girl whom they had stopped by pulling over in front of her. Defendant said that

his girlfriend had found a gold necklace in the back seat of the car and that she had turned it over to the police because she did not want to get involved in this crime. Bottoms testified defendant stated he had stabbed the victim and that he was sorry he had done it. Bottoms had no opportunity to hear any of the media coverage about the murder. He had not been made any promises with regard to his pending cases or his probation in Logan County. He waited from approximately June 9, 1990, until March 20, 1991, to give his statement because at first he did not want to get involved but then it began bothering him, he could not sleep and he realized he would not want this to have happened to his family.

Next, Carl Bowles testified he was incarcerated in the Department of Corrections on a four-year sentence for residential burglary. He also indicated he had a retail theft conviction in Missouri in 1987. He was arrested on April 27, 1990, and was in the cell next to defendant's. Bowles spoke with defendant two or three times regarding defendant's case. He remembered he talked to defendant in July 1990 and also a little bit before that. Bowles indicated defendant told him that they had decided they were going to park their car by the side of the road, wait for somebody to come along to help them out and then they were going to rob that person to get money for beer. Defendant told Bowles that they got carried away and ended up raping the girl that they had stopped. Bowles testified defendant stated he would not be convicted because his parents were going to cover for him saying that he was baby-sitting that evening. Defendant told Bowles this crime occurred in New Berlin and there were three or four people involved. He remembered defendant saying Johnston was there and they had a kid who was kind of slow that was approximately 14 or 15 years old. Defendant told Bowles that they loaded the victim up into the car and took her out to New Berlin and dumped her in a cornfield. Defendant stated that they left both of her car doors open when they left it on the side of the road.

Bowles testified he did not get any deals, bargains, or promises in return for his testimony. He gave this information to the police on July 27, 1990, and he was sentenced on August 3, 1990. He was sentenced to four years in the Department of Corrections, the minimum sentence for residential burglary. He had already been promised this minimum sentence two months before he gave his statement. Bowles moved from Arkansas in January 1990 and was not familiar with any of the details of this case.

William Reed testified he was a resident of the Schuyler County jail and that he had previously been convicted of theft in St. Clair

County. He was awaiting sentencing for possession of cannabis with intent to deliver in Sangamon County. He was in the Sangamon County Jail on June 19, 1990, and became acquainted with defendant. Reed testified defendant told him that he was at his father's house the evening of June 24, 1989, and had dinner. Defendant stated he left his father's house and was headed back to his girlfriend's house when his father picked him up and drove him back to the house. He arrived back at his house between 8:30 and 9:30 p.m. Defendant told Reed that Johnston, Edgington, Mary, Billy and Danny were all at his house that evening.

Defendant indicated they stayed there for a while but at approximately 10 p.m., defendant, Edgington, Johnston and Danny left to get more beer. Defendant told Reed that they had pulled over on the side of the road and it was their intent to stop anyone who came down the road to get money for more beer. At approximately 10:30 p.m., a car came by and they forced the girl out of her car, into his car, and took her toward the road near the Waverly blacktop. Defendant stated that after they had molested her in the cornfield, they decided they had to kill her because she could identify them. Defendant told Reed that he stabbed the victim seven times but then later said he stabbed her numerous times. Defendant said they left the victim in the cornfield without any clothes on. Reed testified that somebody found a necklace in the backseat of the Chevy car that the victim was forced into and that it was given to Mary, who was defendant's girlfriend.

Reed further testified that on June 24, 1990, defendant appeared to be very upset and shaky and had come to discuss with him why everybody else was testifying against him. Defendant said that he was very nervous and upset because this was the first year that the girl had been dead. Reed had not heard about this case on television nor read about it in the newspaper prior to these discussions with defendant. Reed also had not read any police reports or legal documents of defendant while he was in jail. Reed indicated defendant stated that he could not be convicted because they had not found a weapon in this case. No promises had been made to him for his cooperation in this case.

Johnathan Davis testified he was in custody on a theft of a motor vehicle charge and that he had a prior conviction of theft over $300. He testified he was in the Sangamon County jail around July 11, 1990, and became acquainted with defendant. Davis testified that at approximately 8 p.m., he noticed defendant was crying. He asked defendant what was wrong and defendant replied he was just having

problems. Davis gave defendant a cigarette and they sat on the edge of his bed and talked. Defendant said that he had stabbed a girl so many times, and that he did not know that he had done it until it was over. Davis had not heard anything about this case in the media, nor had he looked at any of defendant's documents in order to get information about this case. He had not been promised anything regarding his probation or his pending felony cases.

Finally, codefendant Johnston testified in this matter. Johnston was 30 years old, in the towing business and a mechanic; however, he did not possess a driver's license. He went as far as the ninth grade in school and could read and write a little bit. Johnston had been convicted of aggravated battery and burglary and received probation for both offenses. He was also convicted of retail theft for which he received a fine. He was arrested on July 13, 1989, for public indecency. Johnston was a cousin of Mary and knew defendant lived with her and her children. He also knew Danny and Edgington because Edgington used to date Mary.

Johnston stated that on June 24, 1989, he drank a 12-pack of beer in the morning at his house. At approximately 4 p.m., he and Danny arrived at Mary's house. Present at that time at Mary's house were Edgington, defendant, and Jeff Pocklington. Later on, Sim arrived. He and Danny tried to leave but defendant stopped them so they remained at the house. He had stopped drinking because he did not feel good as he was sick from drinking the 12-pack of beer earlier that morning. He, along with defendant, Edgington and Danny, left the house at approximately 10 p.m. and headed toward New Berlin. They left in Mary's car, a white 1972 Chevrolet, to get more beer. Defendant and Edgington were in the front seat talking about stopping the first car that came along the road in order to rob the driver and it was defendant that said this to Edgington. They stopped their car near a grain bin on the side of the road and got out. This location was approximately 30 minutes away from Mary's house.

Defendant and Edgington got out of the car, went into the road and stopped the first car that came along by holding up their hands. At this time, Johnston and Danny were along the side of the road. Defendant pulled the girl out of her car while Edgington was on the passenger side of the car. Defendant stabbed her in her left arm.

Johnston testified that he and Danny were running ahead of defendant and Edgington at the time. Defendant and Edgington were holding the girl by both of her arms and dragging her down the road. Johnston testified that as they were running along with defendant and Edgington, the girl was yelling. Defendant stated that she had

better shut up or he was going to stab her again. Johnston indicated that when they reached their car, defendant and Edgington forced her inside and they drove off. Defendant was driving and the victim was in the back seat with Edgington. Johnston and Danny were still out along the road and after defendant and Edgington put the girl in the car, they headed in the direction they thought was toward New Berlin.

Johnston and Danny continued up the road in the same direction as the car but when they saw a sign that said Springfield, they realized they were going the wrong way. Johnston testified they walked approximately 20 miles up the road before they realized they were going toward Springfield. When they realized they were going the wrong way, they turned around and began walking the other way. They came back to the girl's car. Johnston indicated the passenger side door was open and Danny kicked it shut with his feet. While they were there by her car, they saw a red Camero drive by heading south. Johnston was not sure what year it was but he realized it was a newer model.

After Danny kicked the door shut, they continued walking down the road and saw a truck going toward New Berlin. They also saw a truck down by the railroad tracks and they hid in the cornfields because they saw a brown and white police car near the grain bin. Johnston believed the squad car was looking for the girl because the officer was looking at a poster. After they saw the police car, Johnston and Danny got a ride with some people who took them back to Modesto. They then got a second ride to Palmyra and arrived at Sim's house at approximately 1 a.m.

When they got there, Edgington and defendant were already there. He estimated it was approximately a couple of hours between when they had left Edgington and defendant on the road and when they arrived at Sim's house. Johnston testified Danny had a red handkerchief which contained a necklace. Danny gave it to Sim and then as they left, Sim gave it back to Danny. After they left, they went to Carlinville to Johnston's mom's house. At Sim's house, Johnston noticed that Danny's shirt had some blood on it. He testified the blood was there because defendant had hit Danny because he believed Danny was going to tell the police what had happened. Johnston testified Danny got the red handkerchief which contained the necklace from defendant. When they went to his mother's house, they could not get in so they went to Nancy's house. When they arrived there, they stayed in a tent in the backyard.

On July 4, 1989, Johnston was at Mary's house at approximately 4 p.m. Defendant, Edgington, Mary, and Danny were all present. At this time, Danny had possession of the necklace. Johnston identified the necklace that had been previously identified as Melissa's necklace as the one that Danny had on June 24, 1989.

Johnston stated that on July 1, 1989, defendant told him to be quiet about what had happened. Johnston testified that a couple of days later, defendant said that he had killed the girl and defendant told him and Danny that they had stabbed her and cut her up. At the time he was charged with this offense, Johnston was told that the State was going to ask for the death penalty if he were convicted. He denied that he had been promised any deals or bargains because of his cooperation in this case. Johnston indicated he was hoping he could get something in return for his testimony, but that he had not been promised anything. Johnston admitted he had told many stories regarding this case and that he had done so because he did not want to be back on the street as he was afraid of defendant. Johnston testified he had been threatened both by defendant and Edgington.

On cross-examination, Johnston admitted that he hoped to get something out of his cooperation in this case but he did not know what he was going to get. He admitted that on the night he was arrested in Macoupin County on the public indecency charge, he blamed defendant for this crime. Johnston testified that he had drunk a 12-pack of beer the morning of June 24, 1989, but stated that at the time this crime took place, he was not drunk. He admitted he had told different stories to the police regarding the details of this event. Johnston testified that some time between June 24, 1989, and July 8, 1989, he was in the Hardee's restaurant in Carlinville and that he told Bud Fenton and Corky Shaff that he had killed the victim. These two men told Johnston not to talk this way because he could get himself into trouble.

Last, the jury was allowed to view the videotape of defendant, Johnston, and Edgington which had been secretly taped at the Sangamon County courthouse in Springfield. Defendant consistently denied any involvement in this crime throughout the entire length of the tape and maintained his story that on June 24, 1989, he had dinner at his parents' house, went back to his house that evening and remained there all night long.

The first witness on behalf of defendant was his father, Vernon McMillan. Vernon testified that his son could neither read nor write. On June 24, 1989, Vernon saw his son at approximately 3:30 in the afternoon when Mary dropped him off in her white 1973 Chevy Ca-

price. Defendant did not appear to have been drinking that day. Defendant went into Vernon's house, took a bath, and ate supper with Vernon and his wife. After supper, defendant tried to locate Mary but was unable to reach her. Vernon testified defendant waited to see if Mary was going to come back that evening and then he became anxious and started walking toward his house. Vernon went into the house and asked his wife where defendant was going and she stated that defendant was going to walk home. Vernon decided that that was too far for his son to walk, so he picked him up and drove him home. He did not know what time they arrived at Mary's residence because he did not look at his watch; however, he did know that it was dark by the time they got there. When they arrived, Danny and Johnston were on the porch and Billy came running out of the house. Mary's car was not there at that time. Vernon dropped defendant off and went home.

The next time Vernon saw defendant was at approximately 9:30 the following morning. He went to defendant's house at that time because he had just received a phone call from Seattle indicating that defendant had become a grandfather. Defendant was dressed like he was the night before and his clothes appeared clean. Vernon testified that when he got home on the evening of June 24, the 10 o'clock news had been on for approximately 15 minutes. It takes approximately 30 minutes to drive from Vernon's house to defendant's house.

On cross-examination, Vernon denied talking with defendant prior to him being arrested about his activities of June 24, 1989. He also denied telling the police that he arrived at defendant's house at 9 p.m. on June 24 and that he got back to his house at approximately 9:40 p.m. Vernon admitted that his son likes to drink beer but denied that he has a drinking problem.

Alberta McMillan, defendant's mother, testified that she saw her son on June 24 when she got home from work. Defendant arrived at their house at approximately 3:30 p.m. in a car driven by Mary Pocklington. Defendant stayed until dark and it was a few minutes after 9 o'clock when he left. She testified her husband drove defendant home and that when he arrived back home the evening news was already on. She believed it was approximately 10:10 when her husband arrived home. On cross-examination, Alberta denied telling Detective Harney that when her husband returned back to their house after taking defendant home, it was 9:40 p.m. She admitted that on July 14, 1989, she discussed with defendant his activities of June 24, 1989.

Billy Pocklington testified that he was 12 years old and he goes to school. He indicated that he had sworn to tell the truth and he knew

what happens to somebody who comes into a courtroom and tells a lie. He knew defendant because he lived with him and his mother, Mary. Billy testified that on June 24, 1989, when he went to bed, defendant, Edgington, himself and Danny were present at his house. He did not see anybody leave the house that evening. He went to sleep on the love seat and at approximately midnight he heard somebody banging on the windows. At that time, he went into bed with defendant and snuggled up against him. He knew what time it was because he had a watch. Billy saw Johnston and Danny sleeping out by the tree in the front yard. He woke up the next morning and defendant was there along with Johnston and Danny. On cross-examination, Billy remembered talking to a lady detective at the Carlinville jail and remembered telling her that he was not really sure whether it was June 21, 23, or 24 that defendant was at the house. Billy indicated that he knew defendant did not leave the house the evening of June 24, 1989, because if he had moved defendant would have awakened him.

Defendant testified that he could not read or write. On June 24, 1989, he left his house with Mary at approximately 1 or 1:30 p.m. and was driven to his father's house. He went there because Mary had told him that she was going to see Edgington that night and that she had also been with him the night before. He went to his parents' house, took a bath, and ate supper. After supper, he called Mary's mother's house to see if Mary was there. He talked to her mother twice and her dad once but never spoke to Mary. He was tired of waiting for Mary and did not want to leave Johnston and Danny alone at his house, so began walking back toward his house. Defendant's father drove him home but he was not sure what time it was; however, he thought it was around 9:30 p.m. When he got home, Johnston, Danny and Billy were at the house. At that time, Johnston was not drinking.

Defendant sat on the porch and talked to them for a while, smoked a cigarette and then went to bed. He did not know what time it was but he remembered when he lit his last cigarette he saw a "1" on his watch. When defendant went to bed, Billy was asleep on the love seat in the house and Danny and Johnston were asleep outside underneath the tree. He testified they were talking very loudly and he yelled at them several times to be quiet. Sometime during the evening, Billy came into his bedroom and curled up against him. Billy lay there for a little bit and then defendant told him he had to get out of the bed in case Mary came home. Defendant got up at 5 a.m. but Mary was still not there. Danny and Johnston were still asleep under-

neath the tree outside the house. Defendant testified he owned a buck knife and a small pocketknife. He indicated he turned the buck knife over to the police. Defendant denied riding in a car with the other co-defendants, pulling over Melissa Koontz' car and stabbing her to death.

Mary testified that she dropped defendant off at his parents' house on June 24, 1989, at approximately 3 p.m. She returned to her house at approximately 7 p.m. and defendant was not there. She left again and did not come home again until the next morning. When she arrived the next morning, Johnston, Danny, Billy, and defendant were at her house. On cross-examination, Mary indicated she told Detective Leonard on May 14, 1990, that she was with Edgington on the evening of June 24, 1989. However, she did not recall whether on the next day she told Detective Leonard that she had lied when she talked to him the previous day as to the whereabouts of Edgington.

On rebuttal, Detective Harney testified he spoke with Vernon McMillan on July 19, 1989. Detective Harney indicated Vernon McMillan told him that on June 24, 1989, he returned to his house at approximately 9:40 p.m. after dropping defendant off at his house. Detective Harney also indicated Alberta McMillan said the same thing. He testified that she stated it was 9:40 p.m. because they always watch the evening news and she was sure that Vernon got home before the evening news began. Detective Harney testified defendant told him that he went to bed at 11 p.m. on June 24, 1989, and that Johnston and Danny were asleep on the floor inside the house and Billy was asleep on the couch.

Detective Leonard testified that he spoke with Mary regarding her whereabouts on June 24, 1989. On May 14, 1990, she told Detective Leonard she was with Edgington on the evening of June 24, 1989. Detective Leonard again spoke to Mary Pocklington on May 15, 1990, on which occasion she told him that she had lied the day before about being with Edgington on June 24, 1989, and that she was in love with Edgington and would do anything to protect him.

After the State's closing argument, defense counsel made a motion for mistrial on the basis that the prosecutor alluded to the fact that the victim may have been raped when there were no rape charges pending against defendant. The trial court denied the motion for mistrial, indicating that there was some evidence as to whether the victim was in fact raped. The jury viewed the videotape once again and then retired to the jury room for deliberations. After approximately three hours of deliberations, the jury returned guilty verdicts of murder, armed robbery and attempt (aggravated kidnapping).

The jury then returned a verdict finding defendant eligible for a sentence of death but found mitigating factors sufficient to preclude the imposition of a death sentence. On December 2, 1991, the court held a sentencing hearing. After hearing evidence and reading the presentence investigation report, the trial court imposed a sentence of natural life imprisonment for murder, finding the conduct of defendant was exceptionally brutal or heinous behavior. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(b).) Defendant timely filed his notice of appeal.

## I. ERRORS REGARDING JOHNSTON'S TESTIMONY

### A. *Mental Health Records of Donald Johnston*

Defendant contends the trial court erred in denying his motion for the production of the psychiatric and psychological evaluation of Johnston which was court-ordered in Johnston's case. Defendant acknowledges that section 10(a) of the Mental Health and Developmental Disabilities Confidentiality Act (Act) (Ill. Rev. Stat. 1989, ch. 91½, par. 810(a)) creates a privilege against disclosure of mental health records between the recipient of mental health treatment and therapist; however, defendant asserts this privilege is overcome by the relevance of this report to the witness' credibility. Defendant asserts Johnston is an alcoholic, borderline mentally retarded, and made several inconsistent statements regarding this incident and it is these factors which make his mental health history relevant to his credibility.

The State initially responds that defendant has waived this argument because the theory of relevance asserted by defendant at trial was his belief that Johnston was "either a sociopath or psychopath" and that this report could "lead me to some relevant and material evidence which would directly affect his credibility and [defense counsel's] ability to destroy his credibility on the stand." Furthermore, the State argues if this issue is not waived, defendant has failed to establish the relevance of this report sufficient to overcome the statutory privilege of confidentiality.

On July 12, 1991, the trial court heard defendant's motion to produce this psychiatric and psychological evaluation. Defendant asserted the above reasons for disclosure of this report. Johnston's attorney, Pete Woody, and the prosecutor both asserted the statutory privilege on behalf of Johnston. The trial court denied the motion to produce this report but told defendant that if he had authority to overrule the claim of confidentiality, he could renew his motion. Defendant presented no authority during the trial nor did he ever renew his motion.

■ ■■■ We believe defendant has waived this issue. First, he failed to renew his motion for production of this report and did not offer the trial court any of the authority which he now asserts supports his contention of error. Moreover, as to the relevance of this report, defendant asserted it was relevant in that it could lead to something which would affect the credibility of the witness. On appeal, defendant asserts this report is relevant to Johnston's credibility because of his alcoholism, mental capacity and inconsistent statements. Clearly, this is a different theory of relevance than that presented to and considered by the trial court. Therefore, defendant has waived this issue. See *People v. Edwards* (1991), 144 Ill. 2d 108, 579 N.E.2d 336; *People v. Steidl* (1991), 142 Ill. 2d 204, 568 N.E.2d 837.

Even addressing defendant's argument, we conclude there was no reversible error in denying his motion for discovery of this report.

Section 10(a) of the Act provides:

"Except as provided herein, in any civil, criminal, administrative, or legislative proceeding, or in any proceeding preliminary thereto, a recipient [patient], and a therapist on behalf and in the interest of a recipient [patient], has the privilege to refuse to disclose and to prevent the disclosure of the recipient's [patient's] record or communications.

(1) Records and communications may be disclosed in a civil, criminal or administrative proceeding in which the recipient [patient] introduces his mental condition or any aspect of his services received for such condition as an element of his claim or defense, if and only to the extent the court in which the proceedings have been brought, or, in the case of an administrative proceeding, the court to which an appeal or other action for review of an administrative determination may be taken, finds, after in camera examination of testimony or other evidence, that it is relevant, probative, not unduly prejudicial or inflammatory, and otherwise clearly admissible; that other satisfactory evidence is demonstrably unsatisfactory as evidence of the facts sought to be established by such evidence; and that disclosure is more important to the interests of substantial justice than protection from injury to the therapist-recipient [patient] relationship or to the recipient [patient] or other whom disclosure is likely to harm." (Ill. Rev. Stat. 1989, ch. 91½, par. 810(a)(1).)

Illinois courts have held that evidence of a witness' mental condition is admissible to the extent that it bears on the credibility of the witness' testimony. (*People v. Monk* (1988), 174 Ill. App. 3d 528, 533, 528

N.E.2d 1063, 1066.) Before such evidence may be introduced, however, its relevance to a witness' credibility must be established. (*People v. Walton* (1982), 107 Ill. App. 3d 698, 703, 437 N.E.2d 1273, 1277.) A two-step procedure for discovery of mental health records has been set up. First, the defendant must sufficiently show that the requested records are material and relevant to the witness' credibility. If that is done, the discovery is permissible. However, if the witness or therapist asserts his statutory privilege, then an *in camera* hearing with counsel present is held on this question. *Monk*, 174 Ill. App. 3d at 534, 528 N.E.2d at 1067.

In *Walton*, defendant's motion for discovery of the victim's mental health records, which were in the possession of State agencies, was denied by the trial court. Defendant relied exclusively on this court's decision in *People v. Phipps* (1981), 98 Ill. App. 3d 413, 424 N.E.2d 727, asserting that the trial court's refusal to provide him with access to the victim's mental health records amounted to reversible error.

In *Phipps*, this court stated:

"When, as in the instant case, a statutory evidentiary privilege comes in direct conflict with a defendant's constitutional rights of confrontation and due process, we hold that the former must give way so that the fundamental protections of our criminal justice system will not be abrogated." (*Phipps*, 98 Ill. App. 3d at 417, 424 N.E.2d at 730.)

This court in *Walton* found *Phipps* distinguishable, stating:

"We do not deem the rule of *Phipps* to be so broad as to negate the necessity of establishing the pertinence of a witness' psychiatric condition or history to the credibility of his or her testimony before such evidence may be introduced or before a witness' otherwise confidential mental health records may be subpoenaed or discovered." (*Walton*, 107 Ill. App. 3d at 703, 437 N.E.2d at 1277.)

The witnesses in *Phipps* suffered from psychiatric disorders so severe that they were long-term residents of a mental hospital and they were institutionalized at the time of the alleged offenses and at the time of trial. In contrast, the victim in *Walton* had been a voluntary patient in a mental hospital but had successfully completed his treatment. He was not hospitalized at the time of the robbery, the time of defendant's trial, or during the intervening period. The only other evidence offered in support of the motion for discovery of the mental health records of the victim was defense counsel's statement that the victim was under medical supervision by the McLean County Center for Human Services. This court found this evidence was not comparable to

that offered in *Phipps* to support the motion for discovery and it was not the type which would have been necessary to establish the relevancy of the information contained in the victim's mental health records to his credibility as a witness. (*Walton*, 107 Ill. App. 3d at 704, 437 N.E.2d at 1277.) Thus, this court held that defendant did not make a sufficient showing that the information contained in the victim's mental health records in the possession of State agencies was relevant to his credibility as a witness. *Walton*, 107 Ill. App. 3d at 704, 437 N.E.2d at 1277.

Likewise, defendant has failed to show the relevance of this report to Johnston's credibility. He asserts three bases for establishing the relevancy of these records. First, he alleges Johnston's alcoholism as a basis for establishing the relevancy of this report. However, Johnston admitted that he had problems with alcohol, had been to AA and had been classified as an alcoholic. Johnston admitted that he drank a 12-pack of beer on the morning of the incident but maintained he was sober at the time it occurred. None of the witnesses testified that they saw him drinking at any time prior to the offense.

Next, defendant asserts Johnston's mental capacity as a basis to establish the report's relevancy. Johnston's mental capacity was evident from his appearance at the trial and his demeanor and actions on the videotape. He testified about his limited education, his ability to only read and write a little bit and the fact that he had only attended school up to the ninth grade, despite the fact that he was 30 years old. He indicated he did not know how to drive a motor vehicle and that his best friend was a 15-year-old retarded boy. Finally, as to the last basis defendant asserts, Johnston was thoroughly cross-examined as to the inconsistent statements he made to the police and the variations of the details of the event.

Defendant contends the trial court should have conducted an *in camera* inspection to determine whether this report was relevant to Johnston's credibility. He asserts that without such an inspection, he must prove the relevance of this report without knowing its contents. We understand defendant's dilemma but do not believe the failure of the trial court to conduct an *in camera* inspection constitutes reversible error. While we strongly urge the circuit courts to conduct such inspections, and note the better procedure in this case would have been for the court to perform such an inspection of the report, since the three bases defendant asserts for divulging this report were clearly presented to the jury, the failure to conduct an *in camera* inspection was not reversible error. Therefore, the trial court did not err in denying the motion for the production of this report.

## B. *Cross-examination of Johnston*

Next, defendant alleges the trial court erred in limiting the scope of cross-examination of Johnston regarding his 1987 aggravated battery conviction. On cross-examination, defense counsel attempted to elicit the details of this aggravated battery conviction by asking the following questions:

"Q. [Defense counsel:] All right—did the—did Detective Mitchell ever ask you about any fights you have had?

A. [Johnston:] No.

Q. About Nancy?

A. No.

Q. Where you beat up Nancy?"

The trial court sustained the State's objection to this last question. Finally, defense counsel attempted to show the witness was violent when drunk and asked "Did you have trouble with women sometimes?" The State objected to this question and defense counsel stated he wanted to show that the witness was highly intoxicated at the time of the offense and had a previous history of fights with women when intoxicated. Defense counsel felt this was relevant to suggest the witness may have committed the acts in question. The trial court sustained the objection to this question.

The State contends defendant has waived this issue for review because he failed to make an appropriate offer of proof. The State notes that despite the fact that Johnston was available to testify in an offer of proof, defense counsel elected to make an informal offer by merely reciting what he thought Johnston's criminal history might show. The State suggests that since Johnston was not called to testify in an offer of proof, there is no basis for determining what his testimony regarding the subject would have been.

It is well recognized that a key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court. The purpose of an offer of proof is to disclose to the trial judge and opposing counsel the nature of the offered evidence and to enable a reviewing court to determine whether exclusion of the evidence was proper. (*People v. Andrews* (1992), 146 Ill. 2d 413, 420-21, 588 N.E.2d 1126, 1131.) The failure to make an adequate offer of proof results in a waiver of the issue on appeal. (*People v. Jackson* (1989), 180 Ill. App. 3d 78, 91, 535 N.E.2d 1086, 1095.) Where an objection is sustained to the offered testimony of a witness, an adequate offer of proof is made if counsel makes known to the trial court, with particularity, the substance of the witness' anticipated answer. An offer of

proof that merely summarizes the witness' testimony in a conclusory manner is inadequate. The offer serves no purpose if it does not demonstrate both to the trial court and to reviewing courts the admissibility of the testimony which was foreclosed by the sustained objection. *Andrews*, 146 Ill. 2d at 421, 588 N.E.2d at 1131-32.

■ Defendant has waived this issue. After the objection to the testimony, defense counsel explained that he wished to bring out the details of this conviction because he wanted to show that the witness was in a high state of intoxication early in the day and that, having had a previous history of involvement in fights, and particularly with women, this evidence was relevant to suggest that he may have committed these acts. Defense counsel failed to specifically state or elicit from the witness the details of this aggravated battery conviction and how it in fact related in any way to the crime involved in this case. Defense counsel's statements merely speculated as to what he believed the relevance of the testimony would be without any reference to what the testimony would actually consist of or how in fact it was relevant at all to the crimes involved. Thus, because of a failure to present an adequate offer of proof, defendant has waived this issue on appeal. Nevertheless, addressing defendant's argument, we find it to be without merit.

It is within the trial court's discretion whether or not to permit cross-examination concerning a witness' prior conviction. A court will overturn a ruling on the scope of cross-examination only where an abuse of discretion results in manifest prejudice to the defendant. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 362, 478 N.E.2d 402, 411.) While the State opened the door on direct examination by inquiring into the witness' past convictions, limits may be placed on the scope of cross-examination once the door has been opened. The opening is not a funnel through which the circumstances of prior convictions can be poured. The witness was not the one on trial and to dredge up the details of his prior conviction would only muddy the waters. *People v. Boclair* (1989), 129 Ill. 2d 458, 478, 544 N.E.2d 715, 724.

In this case, the jury was in the best position to judge Johnston's credibility. All of Johnston's prior convictions, including the aggravated battery conviction, were disclosed to the jury as were the sentences received for those crimes. Moreover, the jury was told that Johnston had been charged with this murder. Johnston was extensively cross-examined by defense counsel about the details of this crime and his motives for testifying against defendant. Thus, the trial court's limitation on the scope of the cross-examination regarding the details of his prior aggravated battery conviction did not impede the

assessment of credibility by the jury nor did it prejudice the defendant in any way. The trial court did not abuse its discretion in limiting the scope of the cross-examination.

## II. CONDUCT OF THE PROSECUTOR

### A. *Alleged Promises of Leniency*

Next, defendant asserts the denial of his motion for disclosure of promises to an accomplice witness denied him a fair trial. Defendant filed a motion "to disclose promises to an accomplice witness, unindicted codefendant or others for forbearance from prosecution, indulgence, reduction of sentence, mitigation or immunity." Defendant contends the State made promises of leniency to Johnston for his cooperation in this matter.

In support of his contention, defendant has attached the circuit court records of Johnston as an appendix to his brief. These records indicate that on September 4, 1991, Johnston pleaded guilty to armed robbery in exchange for the dismissal of the first degree murder and attempt (aggravated kidnapping) charges. Johnston was sentenced on October 28, 1991, to 15 years' imprisonment.

The State alleges it is improper for this court to take judicial notice of the circuit court records in a different proceeding. (See *People v. Washington* (1966), 81 Ill. App. 2d 90, 96, 225 N.E.2d 472, 476.) We note that the docket entry for December 2, 1991, contains the following notation: "This case is consolidated with Peo. v. Donald Johnston, 89—CF—368 for purposes of appeal." At the sentencing hearing, defense counsel moved to have the presentence report and sentencing order of Johnston included in this record on appeal so that this court would consider it when reviewing defendant's case. The State had no objection to this consolidation.

Accordingly, the subsequent sentence of Johnston is properly before this court without us having to take judicial notice of Johnston's circuit court records. We note, however, that rather than attaching these records to his brief as an appendix, defendant should have instead made a motion to supplement the record on appeal.

Nevertheless, because we find the sentence received by Johnston is not dispositive of the issue raised by defendant, we will review those records in our analysis.

Defendant argues he was prejudiced by the State's failure to comply with a motion to disclose promises to an accomplice witness when the evidence suggests that Johnston was in fact promised something in exchange for his testimony and cooperation with the prosecution.

At the hearing on this motion, defense counsel explained to the court that he sought disclosure of any promises made to any of the codefendants. The following exchange then took place:

"THE COURT: Okay. Mr. Cadagin?

MR. CADAGIN [(Prosecutor)]: Judge, we have made no promises or bargains or deals with any of our witnesses.

THE COURT: Satisfied with that response?

MR. COSTELLO [(Defense Counsel)]: If Mr. Cadagin says it, I have to be, Your Honor.

THE COURT: Okay. Next motion?"

Accordingly, the State did comply with the defense motion and defendant's argument that he suffered prejudice must be rejected unless he can present evidence to show that there were promises made to Johnston which the prosecutor knew about but failed to disclose at the hearing. Johnston was the first defendant arrested, yet was the final defendant tried and convicted. After defendant's conviction, the murder charge against Johnston was dropped and he pleaded guilty to armed robbery. Johnston's attorney, Pete Woody, testified that he told Johnston that he would have to "trust the State's Attorney" for consideration of leniency.

In *People v. Griffin* (1984), 124 Ill. App. 3d 169, 463 N.E.2d 1063, defendant was convicted of murder and armed violence. On appeal, defendant alleged that a witness' denial of any promises or negotiations with the prosecution's office regarding theft charges pending against him created the false impression that he was an unbiased witness for the State. The court noted that at trial, the witness created the impression that there was no connection between his testimony and the theft charge pending against him. The witness testified that he did not know that his case was scheduled for disposition after the murder trial, that he knew of no promises or negotiations concerning his case and that he had not talked to his lawyer about it at any time. (*Griffin*, 124 Ill. App. 3d at 182, 463 N.E.2d at 1072.) However, at the post-trial hearing, the State's Attorney admitted there was an understanding with the witness' attorney that the State wanted the witness' cooperation in the murder trial and that they were holding off on the theft trial in order to maintain leverage on the witness. The court noted that no leverage would have been possible unless the witness knew his actions were being watched. Although the witness had denied that his attorney ever told him of the understanding, the State's Attorney had conveyed to the witness' attorney the assurance that his cooperation would be taken into account and it was unlikely that an attorney would have withheld information about a possible

benefit to his client gained through his own actions. The court noted that the witness' testimony was the keystone to the State's case and that his credibility was, therefore, an important issue. The court stated:

> "The jury was entitled to know of any understanding in order to assess his credibility. It is not only negotiated promises which may induce bias; expectations or even hopes for leniency may have their effect. [Citation.] It was the State's duty to correct any false impression left by [the witness'] flat denial that he expected any consideration from the State." (*Griffin*, 124 Ill. App. 3d at 182-83, 463 N.E.2d at 1072-73.)

Accordingly, defendant there was entitled to a new trial.

In *People v. Bolton* (1973), 10 Ill. App. 3d 902, 295 N.E.2d 11, defendant was convicted of murder and appealed contending that the State knowingly used perjured testimony to obtain the conviction. In that case, the only evidence connecting the defendant with the murder was the testimony of one witness who was one of the suspects in the case and who gave a statement which implicated defendant in the murder. The State had promised that witness that if he testified against defendant, charges against him would be handled in juvenile court. The prosecutor at trial knew of the agreement. The witness knew of the agreement but repeatedly denied that he had been promised anything for his testimony. Instead of disavowing the false testimony of the witness, the prosecutor based his closing argument on that testimony. *Bolton*, 10 Ill. App. 3d at 906, 295 N.E.2d at 14.

The court noted that the prosecutor made no attempt to explain the false testimony of the witness, and rather, he chose to stand by it and used it in his final argument. The court concluded that the State's case depended entirely on the witness' testimony and without it, there could have been no indictment and no evidence to carry the case to the jury. Thus, the witness' credibility was an important issue in the case and evidence of any understanding or agreement as to his prosecution would be relevant to his credibility and the jury was entitled to know it. A new trial was required if the false testimony could in any reasonable likelihood have affected the judgment of the jury. (*Bolton*, 10 Ill. App. 3d at 908, 295 N.E.2d at 16.) Thus, since the credibility of a witness was the basis for the State's case and the jury was not aware of all of the potential biases of that witness, defendant was entitled to a new trial.

These cases are easily distinguishable from the case at bar. In each of those cases, the witnesses lied about any promises made to them regarding leniency in exchange for their cooperation. False tes-

timony was left uncorrected by the prosecution and the jury was not informed of the potential motive or bias of the witness in testifying.

■■ On the contrary here, both the prosecutor and Johnston were very candid about his motive for testifying. The prosecutor specifically asked him whether he had been made any promises in exchange for his cooperation. Johnston admitted that he hoped to gain something by his cooperation but stated that no promises had been made to him. Johnston was aware of the fact that he could get the death penalty in his case if he was convicted of murder.

Johnston's attorney testified that Johnston knew his trial was scheduled for the day of the videotape and that if he did not cooperate (in terms of the videotape), he would go to trial that day. Johnston's attorney testified that no deals were made between the prosecutor and himself. Johnston's attorney simply told Johnston he would have to "trust the State's Attorney" that if he did come forward and cooperate with them, he would get something in exchange for his cooperation.

The only evidence to suggest that a deal was made is the records of Johnston's case which indicate that after defendant's trial, the murder charges against Johnston were dropped and he pleaded guilty to a charge of armed robbery. Johnston, the prosecutor, and Johnston's attorney all indicated there were no deals made, no promises of leniency, and that Johnston only *hoped* to get something. The jury was able to judge the credibility of Johnston and was fully informed of any motive or bias he might have for testifying. The jury was well aware of the leverage the State had over Johnston and that that could have been the basis for his cooperation in this matter. Defendant cannot show that he was prejudiced by any promises of leniency when there is no evidence to suggest that there were any such promises made.

### B. *Alleged Rape of the Victim*

Defendant suggests he was irreparably prejudiced by references in the prosecutor's closing argument to the allegation that Melissa was raped when he was not charged with that offense. Defendant argues it is improper for a prosecutor to make inflammatory statements to the jury on matters not in evidence.

It is improper for a prosecutor to do or say anything in argument, the only effect of which would be to inflame the passion or arouse the prejudice of the jury against the defendant without throwing any light on the question for decision. (*People v. Smith* (1990), 141 Ill. 2d 40, 60, 565 N.E.2d 900, 908.) However, it is perfectly permissible for counsel to base his argument on the facts proved and legitimate infer-

ences drawn therefrom. (*People v. Britz* (1989), 185 Ill. App. 3d 191, 203, 541 N.E.2d 505, 513.) The prosecutor has wide latitude in closing argument, and the trial court's determination of the propriety of that argument will not be disturbed absent a clear abuse of discretion or substantial prejudice to defendant. *People v. Dotson* (1991), 214 Ill. App. 3d 637, 647, 574 N.E.2d 143, 150.

■■■ Initially, defendant has waived any argument regarding references to the possible rape by the prosecutor in his closing argument. Defendant waived errors, if any, in the arguments made by the prosecutor in his opening and closing statements in prosecution for murder by failing to make timely objection to arguments during trial. (*People v. Bartall* (1983), 98 Ill. 2d 294, 321, 456 N.E.2d 59, 72.) Numerous times throughout the trial, both the prosecutor and defense counsel mentioned the possibility of rape. On direct examination of Dr. Johnson, references were made to the alleged rape of Melissa. The prosecutor asked Dr. Johnson whether there was any evidence of rape. Defense counsel's objection was sustained. Yet, on cross-examination, defense counsel specifically questioned Dr. Johnson about evidence of rape. Defense counsel elicited the fact that there was no physical evidence of rape, no evidence of spermatozoa nor could it be determined whether there was any injury to the genitalia. Moreover, further references to the possible rape were made during the testimony of Huddleston, Bowles and Reed. Defense counsel did not object to these remarks. Thus, as defendant failed to object (except once which was sustained) during the entire trial to any references to a possible rape and in fact questioned the physician and one other witness about the possibility of rape, he has waived this issue.

Even addressing defendant's contention, we find the prosecutor did not commit any error in referring in his closing argument to the possible rape of Melissa. The prosecutor's statements regarding the possible rape were logical inferences based on the evidence presented. First, Dr. Johnson testified that Melissa's panties were torn and that there were slits in her bra which could have been caused by a knife. Dr. Johnson stated the test for spermatozoa was negative. He was very specific in saying he could not determine whether she had been sexually assaulted because the body was so decomposed that such a determination was impossible. Three of five inmates who testified against defendant indicated that defendant had said to them that Melissa had been raped. Thus, the comments by the prosecutor regarding the possible rape were logical inferences from the evidence and, therefore, were not improper.

Finally, even if these statements were improper, any error was removed when the jury was instructed that closing statements were not evidence. *People v. Thomas* (1990), 137 Ill. 2d 500, 530, 561 N.E.2d 57, 69.

### III. SUFFICIENCY OF THE EVIDENCE

Defendant next contends the State failed to prove him guilty beyond a reasonable doubt of murder, armed robbery, and attempt (aggravated kidnapping). Defendant alleges the testimony of Johnston was completely unbelievable and unreliable because he was a mentally slow alcoholic who gave numerous conflicting stories about the murder. Furthermore, defendant asserts Johnston was unreliable because he believed he would receive lenient treatment from the prosecution if he cooperated and incriminated defendant.

The critical inquiry on review of the sufficiency of the evidence to support a conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) A reviewing court will not retry defendant when considering a challenge to the sufficiency of the evidence; instead, determinations of weight to be given to the witnesses' testimony, their credibility, and reasonable inferences to be drawn from the evidence are the responsibility of the fact finder. (*People v. Steidl* (1991), 142 Ill. 2d 204, 226, 568 N.E.2d 837, 845.) Despite the suspicion inherent in accomplice testimony, the fact that the State's key witnesses in this case were defendant's alleged accomplices only went to the weight of their evidence; whether their testimony formed a sufficient basis for conviction was for the jury to decide. (*People v. Cadwallader* (1989), 181 Ill. App. 3d 488, 497, 536 N.E.2d 1319, 1325.) The resolution of the factual disputes and assessment of the credibility of witnesses is for the trier of fact, and a reviewing court will not reverse a conviction unless the evidence is so unsatisfactory or improbable that a reasonable doubt as to defendant's guilt remains. *People v. Wise* (1984), 128 Ill. App. 3d 330, 333-34, 470 N.E.2d 1155, 1157.

Defendant attacks the testimony of Johnston and the inmates that testified against him. Defendant alleges their testimony cannot be accepted. However, the potential biases and motives of each of these witnesses were specifically pointed out to the jury. As to Johnston, the jury was well aware of the fact that he had not yet been tried for this crime and that he had a hope of gaining something for his cooperation in this matter. Likewise, as to the inmates who testi-

fied against defendant, each was specifically asked whether he had been promised anything in return for his testimony and whether he had been sentenced yet.

The jury was clearly informed of the lack of physical evidence connecting defendant to this crime. Testimony of the detectives who inspected and examined Melissa's car indicated there was no blood nor were there any fingerprints found in her car. The murder weapon was never found. On the other hand, the necklace which Melissa's mother had seen in her car before the murder was given to the police by Mary, with whom defendant resided. Moreover, the jury was able to view the videotape on which defendant consistently denied having any involvement in this crime despite continued questioning from Johnston and Edgington.

The inconsistencies in Johnston's statements were shown to the jury through the testimony of the officers to whom the statements were made as well as Johnston's denial of making certain statements and admission of making false statements. The car which defendant drove and which was used in this murder was seen by Daniel Thomas parked near the grain bin approximately where Melissa's car was found. Accordingly, the evidence was sufficient to convict defendant of these crimes beyond a reasonable doubt.

## IV. Jury Instructions

Finally, defendant contends the jury was improperly instructed with respect to the first degree murder charge based on the forcible felony of attempt (aggravated kidnapping) (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3)) and the charge of attempt (aggravated kidnapping) (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4(a), 10—2(a)(3)). Defendant asserts an actual kidnapping took place and since the jury was instructed on attempt (aggravated kidnapping), it was "hopelessly confused." Defendant claims he was irreparably prejudiced by this confusion.

At the close of the State's evidence, defendant moved for a directed verdict of acquittal on the felony murder charge based on the predicate offense of attempt (aggravated kidnapping) and the offense of attempt (aggravated kidnapping) on the ground that the evidence indicated the offense had been completed rather than merely attempted. The State argued that defendant was charged with attempt (aggravated kidnapping) because it was uncertain exactly when the victim was killed and, if she was killed on the way to the car or died in the car, it could be argued by the defense that this was not a kidnapping. The court allowed defendant's motion and directed verdicts on these two counts. Subsequently, the court reversed its ruling and

reinstated both counts upon the authority of *People v. Wallace* (1974), 57 Ill. 2d 285, 312 N.E.2d 263. The jury was instructed on the offense of first degree murder based on the forcible felony of attempt (aggravated kidnapping) and the offense of attempt (aggravated kidnapping). Defendant objected to these instructions.

In *Wallace*, defendants were convicted of attempting to bribe two police officers. The defendants were seized by two police officers along with a large sum of money and placed in custody. As they were being transported to the police station, defendants proffered the money to the officers in return for their release. Their offer was rejected and the defendants were charged with attempted bribery.

On appeal, defendants challenged the validity of the indictment alleging that the offense of attempted bribery did not exist and, even if the offer of money had been refused, as it was, that act constituted bribery rather than attempted bribery. The supreme court rejected this argument, finding that there was no explicit statutory requirement that the official accept the property in order to charge the offeror with bribery. The mere offer or promise with the requisite intent was sufficient to constitute the completed offense of bribery. The court noted that it was recognized in various jurisdictions that one may be convicted of an attempt to commit an offense even if the evidence indicates that the crime has been completed. (*Wallace*, 57 Ill. 2d at 290, 312 N.E.2d at 266.) The court noted that the committee commentary to section 8—4 of the Criminal Code of 1961 (Criminal Code) (Ill. Ann. Stat., ch. 38, par. 8—4, Committee Comments, at 499 (Smith-Hurd 1989)) showed the legislative intent to abrogate the necessity that the criminal act fail as a prerequisite to a prosecution for attempt. The court stated:

> " 'Under the sound view an attempt to commit a crime is punishable whether the effort resulted in failure or success, although the charge and conviction should normally be for the offense itself if evidence of consummation is clear. But since the attempt is a part of the offense itself, and the whole of necessity includes every part, it follows that one successful attempt cannot possibly support two convictions—one for the part (attempt) and the other for the whole (offense).' " (*Wallace*, 57 Ill. 2d at 291, 312 N.E.2d at 266, quoting Perkins, Criminal Law 557 (1969).)

Accordingly, the court held the indictment was valid.

Section 8—4(a) of the Criminal Code provides:

> "A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substan-

tial step toward the commission of that offense." (Ill. Rev. Stat. 1989, ch. 38, par. 8—4(a).) It is not a defense to a charge of attempt that because of a misapprehension of circumstances it would have been impossible for the accused to commit the offense attempted. (Ill. Rev. Stat. 1989, ch. 38, par. 8—4(b).) Section 10—2(a)(3) of the Criminal Code states:

"A kidnaper within the definition of paragraph (a) of Section 10—1 is guilty of the offense of aggravated kidnaping when he:

\* \* \*

(3) Inflicts great bodily harm or commits another felony upon his victim." (Ill. Rev. Stat. 1989, ch. 38, par. 10—2(a)(3).)

Section 10—1(a) of the Criminal Code defines kidnapping as:

"(a) \* \* \* when a person knowingly:

(1) And secretly confines another against his will, or

(2) By force or threat of imminent force carries another from one place to another with intent secretly to confine him against his will, or

(3) By deceit or enticement induces another to go from one place to another with intent secretly to confine him against his will." Ill. Rev. Stat. 1989, ch. 38, pars. 10—1(a)(1), (a)(2), (a)(3).

■ The evidence indicated that Melissa was taken from her car to the place where her body was found in the cornfield. The evidence of the injuries to the body are indicative of the fact that this was done against her will. The jury could properly find all the elements of attempt (aggravated kidnapping) present in this case. Based on *Wallace*, it does not matter that the offense may have been completed. Logically, if the offense was completed, the necessary element of attempt, *i.e.*, that a substantial step toward the commission of the offense occurred, must also be present. Inasmuch as a failure to complete the offense is not a defense to attempt, the completion of the offense should also not be a defense to attempt. Clearly, defendant could not be convicted of both attempt (aggravated kidnapping) and aggravated kidnapping; however, he was only charged with attempt (aggravated kidnapping) and felony murder based on the felony of attempt (aggravated kidnapping). Thus, we hold the jury was properly instructed in this matter.

To summarize, we affirm the trial court for the following reasons. First, defendant failed to show the relevance of Johnston's psychiatric and psychological records sufficient to overcome the statutory privilege of confidentiality. Next, the trial court properly limited the scope of cross-examination of Johnston regarding the details of his aggra-

vated battery conviction. Third, defendant suffered no prejudice when there was no evidence to suggest that promises of leniency were made to Johnson and the jury was completely informed of his potential motive and bias for testifying against defendant. Fourth, the prosecution's closing argument was proper with regard to the references to the possible rape of Melissa when defendant failed to object to any references during the trial and those references were based on the evidence presented at trial. Fifth, the State proved beyond a reasonable doubt that defendant was guilty of murder, armed robbery and attempt (aggravated kidnapping). Finally, the jury was properly instructed with regard to felony murder based on the predicate offense of attempt (aggravated kidnapping) and the offense of attempt (aggravated kidnapping) even though the evidence suggested the offense may have been completed.

Affirmed.

COOK and GREEN, JJ., concur.